## LOCAL LODGE NO. 1424, INTERNATIONAL ASSO-CIATION OF MACHINISTS, AFL–CIO, ET AL. *v.* NATIONAL LABOR RELATIONS BOARD.

No. 44. Argued January 11, 1960.—Decided April 25, 1960.

*Bernard Dunau* argued the cause for petitioners. With him on the brief were *Plato E. Papps, Louis P. Poulton* and *Frank L. Gallucci.*

*Norton J. Come* argued the cause for respondent. On the brief were *Solicitor General Rankin, Stuart Rothman, Thomas J. McDermott* and *Dominick L. Manoli.*

*J. Albert Woll, Theodore J. St. Antoine* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* in support of petitioners.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The question we decide in this case is whether unfair labor practice complaints, whose charges against these petitioners were sustained by the National Labor Rela-

tions Board, were barred by the six-month statute of limitations contained in § 10 (b) of the National Labor Relations Act, as amended, 61 Stat. 146, 29 U. S. C. § 160 (b). That section reads in pertinent part:

"*Provided* . . . no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . . ."

On August 10, 1954, petitioners Bryan Manufacturing Company and the International Association of Machinists, AFL, entered into a collective bargaining agreement for a unit of Bryan's employees. The agreement, as later supplemented in certain respects not material to this litigation, contained the conventional provisions, of which two are relevant here: the "recognition" clause, by which the Union was recognized as "the sole and exclusive bargaining agency for all employees" in the unit; and the "union security" clause, by which all employees were required, subject to a 45-day grace period, to become and remain members of the Union. On August 30, 1955, a new agreement was entered into, with Bryan, the Union, and petitioner Local Lodge No. 1424, IAM, as signatories, replacing the old agreement and applying additionally to employees at a newly opened plant as well as to those covered by the original agreement.

When the original agreement was executed on August 10, 1954, the Union did not represent a majority of the employees covered by it.[1] Under §§ 7 and 8 of the Act[2]

---

[1] It was so found by the Board, and petitioners have not challenged that finding.

[2] Section 7 (61 Stat. 140, 29 U. S. C. § 157) provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through repre-

the Board has evolved the principle, not drawn in question here, that it is an unfair labor practice for an employer and a labor organization to enter into a collective bargaining agreement which contains a union security clause, if at the time of original execution the union does not represent a majority of the employees in the

sentatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a) (3)."

Section 8 (61 Stat. 140, as amended, 29 U. S. C. § 158) provides:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: . . . .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8 (a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, . . . if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective-bargaining unit covered by such agreement when made; . . .

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: . . .

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) . . . ."

unit.[3] The maintaining of such an agreement in force is a continuing violation of the Act, and the "majority status" of the union at any subsequent date—including the date of execution of any renewals of the original agreement—is immaterial, for it is presumed that subsequent acquisition of a majority status is attributable to the earlier unlawful assistance received from the original agreement.[4]

In June and August 1955, 10 months and 12 months after the execution of the original agreement, charges were filed with the Board and served upon the petitioners, alleging the Union's lack of majority status at the time of execution and the consequent illegality of the continued enforcement of the agreement. Complaints were thereafter issued by the Board's General Counsel against the Union and the Company. Petitioners contended before the Board that the complaints were barred by the limitations proviso of § 10 (b), set forth above. The Board, two members dissenting, held that the complaints were not barred by limitations, 119 N. L. R. B. 502, and the Court of Appeals affirmed, one judge dissenting. 105 U. S. App. D. C. 102, 264 F. 2d 575. We granted certiorari, 360 U. S. 916, because of the importance of the question in the proper administration of the National Labor Relations Act. For reasons given in this opinion

---

[3] The same doctrine is applied to an agreement containing only a "recognition" clause making a union the exclusive bargaining agent for all employees in the unit covered by the agreement. See *Bernhard-Altmann Texas Corp.*, 122 N. L. R. B. 1289; *Charles W. Carter Co.*, 115 N. L. R. B. 251, 262; *International Metal Products Co.*, 104 N. L. R. B. 1076; *John B. Shriver Co.*, 103 N. L. R. B. 23, 38; and see the Trial Examiner's discussion in the present case, 119 N. L. R. B. 502, 555, n. 98. The agreement now in question contained both a union security and a recognition clause, but for convenience we shall deal with the matter in terms of the union security clause alone.

[4] See 119 N. L. R. B., at 546, 548.

we hold that the complaints against these petitioners are barred by time.[5]

We first note the opposing contentions of the parties. The Board starts with the premise that a collective bargaining agreement which contains a union security clause valid on its face, but which was entered into when the Union did not have a majority status, gives rise to two independent unfair labor practices, one being the execution of the agreement, the other arising from its continued enforcement. Conceding that a complaint predicated on the *execution* of the agreement here challenged was barred by limitations, the Board contends that its complaint was nonetheless timely since it was "based upon" the parties' continued *enforcement,* within the period of limitations, of the union security clause. It is then said that even though the former was itself time-barred, the unlawful execution of the agreement was nevertheless "relevant in determining whether conduct within the 6-month period was unlawful," 119 N. L. R. B., at 504; and that evidence as to it was admissible because § 10 (b) is a statute of limitations, and not a rule of evidence.

On the other hand, petitioners contend that, standing alone, the union security clause and its enforcement were wholly innocent; that they were tainted only by virtue of the original unlawful execution of the agreement; and that since a complaint based upon that unfair labor practice was barred by limitations, that event itself could not be utilized to infuse with illegality the otherwise legal union security clause or its enforcement. They say, in short, that to apply in this situation the doctrine that § 10 (b) is a statute of limitations, and not a rule of evidence, is to circumvent the purposes of the section, and

---

[5] The petition for certiorari also raised an issue as to the propriety of the relief ordered by the Board. Because of our view of the case it becomes unnecessary to reach that question.

that acceptance of the Board's position would mean that the statute of limitations would never run in a case of this kind. We think petitioners' position represents the correct view of the matter.

It is doubtless true that § 10 (b) does not prevent all use of evidence relating to events transpiring more than six months before the filing and service of an unfair labor practice charge. However, in applying rules of evidence as to the admissibility of past events, due regard for the purposes of § 10 (b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10 (b) ordinarily does not bar such evidentiary use of anterior events.[6] The second situation is that where con-

---

[6] The most frequently cited Board expression of this principle is that found in *Axelson Mfg. Co.*, 88 N. L. R. B. 761, 766:

"As I interpret the statute however, Section 10 (b) enacts a statute of limitations and not a rule of evidence. It forbids the issuance of complaints and, consequently, findings of violation of the statute in conduct not within the 6 months' period. But it does not, as I construe it, forbid the introduction of relevant evidence bearing on the issue as to whether a violation has occurred during the 6 months' period. Events obscure, ambiguous, or even meaningless when viewed in isolation may, like the component parts of an equation, become clear, definitive, and informative when considered in relation to other action. Conduct, like language, takes its meaning from the circumstances in which it occurs. Congress can scarcely have intended that the Board, in the performance of its duty to decide the validity of conduct within the 6 months' period, should ignore reliable, probative, and substantial evidence as to the meaning and the nature of the conduct. Had such been the intent, it seems reasonable to assume that it would have been stated."

The Board, however, has developed certain limits on the applicability of this principle. See p. 421, *post*, and note 13.

duct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely "evidentiary," since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice.

The situation before us is of this latter variety, for the entire foundation of the unfair labor practice charged was the Union's time-barred lack of majority status when the original collective bargaining agreement was signed. In the absence of that fact enforcement of this otherwise valid union security clause was wholly benign.[7] The

---

[7] It was the view of one member of the Board majority that a presumption of illegality should attend the enforcement of a union security clause, so that sufficient proof of violation results merely from a showing that such a clause is operative, thus putting on the parties to the agreement the burden to defend by proving compliance with the requirements of the proviso to § 8 (a)(3) of the Act, 61 Stat. 140, as amended, 29 U. S. C. § 158 (a)(3), see note 2, *ante,* including majority status at the time of execution. 119 N. L. R. B., at 510. While acceptance of this view would concededly support the result reached below, it was not adopted by the Board, as the concurring member acknowledged. *Id.,* at 511. We too reject it. It rests on the mistaken judgment that the proviso to § 8 (a)(3) permits the inclusion of union security provisions "in derogation of the rights guaranteed employees in the definitive statement of national policy contained in Section 7," *id.,* at 510, and on the principle that, exoneration of certain types of union security clauses having been granted in a proviso, the burden of proving the proviso's applicability rests on him asserting it. The latter principle need not detain us; insights derived from syntactical analysis form a hazardous basis for the explication of major legislative enactments. . As to the argument drawn from § 7, it would be enough to note that that very provision is in terms limited by the scope of the § 8 (a)(3) proviso. (See note 2,

Trial Examiner, whose findings were adopted by the Board, observed:

"The General Counsel concedes that the 6-month limitation of Section 10 (b) of the Act precludes currently finding the *execution*[8] of the 1954 agreement to be an unfair labor practice, and also precludes currently finding its *enforcement* to be an unfair labor practice . . . at any time prior to the . . . periods beginning 6 months prior to the . . . charges . . . . However, this concession in no way detracts from the crucial nature of the earlier events, because at the core of the General Counsel's contentions as to all of the unfair labor practices is his fundamental position that, *because of the circumstances prevailing when made,* the original union-security agreement of 1954 has never been valid or legal, since it has never met certain overriding requirements of Section 8 (a)(3) of the Act." 119 N. L. R. B., at 530. (Emphasis added, except as indicated.)[9]

---

*ante.*) More to the heart of the matter, it is the entire Act, and not merely one portion of it, which embodies "the definitive statement of national policy." It is well known, and the legislative history of the 1947 Taft-Hartley amendments plainly shows, that § 8 (a)(3)—including its proviso—represented the Congressional response to the competing demands of employee freedom of choice and union security. Had Congress thought one or the other overriding, it would doubtless have found words adequate to express that judgment. It did not do so; it accommodated both interests, doubtless in a manner unsatisfactory to the extreme partisans of each, by drawing a line it thought reasonable. It is not for the administrators of the Congressional mandate to approach either side of that line grudgingly.

[8] Emphasis here by the Trial Examiner.

[9] These observations were accepted both by the Board and the Court of Appeals. 119 N. L. R. B., at 503–504; 105 U. S. App. D. C., at 106, 264 F. 2d, at 579. See also *Lively Photos, Inc.,* 123 N. L. R. B. 1054.

Where, as here, a collective bargaining agreement and its enforcement are both perfectly lawful on the face of things, and an unfair labor practice cannot be made out except by reliance on the fact of the agreement's original unlawful execution, an event which, because of limitations, cannot itself be made the subject of an unfair labor practice complaint, we think that permitting resort to the principle that § 10 (b) is not a rule of evidence, in order to convert what is otherwise legal into something illegal, would vitiate the policies underlying that section. These policies are to bar litigation over past events "after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused," H. R. Rep. No. 245, 80th Cong., 1st Sess., p. 40,[10] and of course to stabilize existing bargaining relationships.

Our view of the matter is lent support by the attitude of the Board itself, whose previous decisions, albeit not always with unanimity among its members or even perhaps with perfect consistency, have recognized that evidentiary rules as to past events must be regarded differently in the two situations we have already depicted. Compare, *e. g., Potlatch Forests, Inc.*, 87 N. L. R. B. 1193, where evidence as to events during the barred period was used to illuminate current conduct claimed in itself to be

---

[10] The Examiner's Report shows the pertinency of this statutory purpose in the present case. In his analysis of the evidence, he observed:

"It is evident that with many witnesses testifying as to numerous different matters, it would protract this report greatly to summarize all of the testimony, or to spell out fully the confusion and inconsistencies therein, much of which is not too surprising, in view of the fact that, with respect to the events of August 1954 [the events "at the core" of the allegations of illegality], there had been a lapse of almost 15 months before testimony was given in November 1955." 119 N. L. R. B., at 529.

an unfair labor practice,[11] with *Bowen Products Corp.,*
113 N. L. R. B. 731, and *Greenville Cotton Oil Co.,* 92
N. L. R. B. 1033, aff'd *sub nom. American Federation of
Grain Millers, A. F. L.* v. *Labor Board,* 197 F. 2d 451,
where the gravamen of the unfair labor practice com-
plained of lay in a fact or event occurring during the
barred period.[12]

---

[11] In that case, in explaining his consideration of "relevant evidence"
antedating the six-month period, the Trial Examiner, whose report
was confirmed by the Board, said: "The Respondent's earlier conduct
has been considered here merely for the purpose of bringing into
clearer focus the conduct in issue. Even without such consideration,
however, the allegations of discrimination would have been found
amply supported by such undisputed record facts as bear directly
upon the layoffs of [the employees involved within the six-month
period]." 87 N. L. R. B., at 1211. See also *Local 1418, International
Longshoremen's Assn.,* 102 N. L. R. B. 720, 729–730, relied on by
the Board, and *Labor Board* v. *General Shoe Corp.,* 192 F. 2d 504;
*Labor Board* v. *Clausen,* 188 F. 2d 439; and *Superior Engraving Co.*
v. *Labor Board,* 183 F. 2d 783, cited by a dissenting opinion here.

[12] In *Bowen Products* an employee recalled from layoff was dis-
criminatorily placed at the bottom of the relevant seniority list.
He unsuccessfully attempted to obtain his proper seniority rating,
and several months later was included in an economic reduction in
force. Had his seniority originally been properly computed, he would
not have been laid off at that time. The charge was filed and served
within six months of the layoff, but more than six months after the
original determination of seniority status. Finding that the only
basis for a holding of unlawful layoff would be a finding that that
determination had been a violation of the Act, the Board dismissed
the complaint.

*Greenville Cotton Oil (American Federation of Grain Millers)*
dealt with an alleged discriminatory refusal to reinstate strikers.
Conceding that the respondent had engaged permanent replacements,
the strikers demanded reinstatement on the ground that the strike
had been caused or prolonged by an unfair labor practice committed
by the employer prior to the hiring of the replacements. The acts
alleged to have constituted such unfair practices having taken place
more than six months prior to the filing and service of the charge,
the Board held § 10 (b) a bar to an order of reinstatement.

Indeed, some Board cases have gone even further and held § 10 (b) a bar in circumstances when, although none of the material elements of the charge in a timely complaint need necessarily be proved through reference to the barred period—so that utilization of evidence from that period is ostensibly only for the purpose of giving color to what is involved in the complaint—yet the evidence in fact marshalled from within the six-month period is not substantial, and the merit of the allegations in the complaint is shown largely by reliance on the earlier events. See, *e. g., News Printing Co.,* 116 N. L. R. B. 210, 212; *Universal Oil Products Co.,* 108 N. L. R. B. 68; *Tennessee Knitting Mills, Inc.,* 88 N. L. R. B. 1103.[13]

---

[13] The complaint in *News Printing Co.* alleged that a refusal to grant wage increases to certain employees had been motivated by displeasure at their union activities. As a substantive matter, this allegation turned on the respondent's motive at the time of the refusal, which was within the limitations period. However, the General Counsel was unable to produce sufficient evidence, from within that period, to prove discriminatory motive, and the Board refused to permit reliance on evidence relating to acts occurring prior to the six-month period. The contention that such earlier acts could be referred to in order to justify the inference that the "pattern of unlawful conduct . . . continued on into the present situation" was rejected. 116 N. L. R. B., at 211. Compare *Paramount Cap Mfg. Co.,* 119 N. L. R. B. 785, 786, 799, enforcement granted, 260 F. 2d 109, where the presence of substantial post-limitations evidence was held to justify resort to evidence of earlier conduct.

The *Universal Oil Products* and *Tennessee Knitting Mills* cases concerned allegations that respondent employers had dominated or assisted labor organizations. Here again, the material issue was as to the relationship of the respondents to the unions involved, as of the date of the charge. Yet in both cases, because the evidence from within the statutory period was too sketchy to warrant a finding of unlawful conduct, the Board refused to permit reference to evidence from the earlier period, declining to rely on an inference that earlier unlawful relationships continued.

While it is true that in *Paint, Varnish & Lacquer Makers Union (Andrew Brown Co.),* 120 N. L. R. B. 1425, the Board found union

However, we express no view on the problem raised by such cases, for here we need not go beyond saying that a finding of violation which is inescapably grounded on events predating the limitations period is directly at odds with the purposes of the § 10 (b) proviso.[14]

The applicability of these principles cannot be avoided here by invoking the doctrine of continuing violation. It may be conceded that the continued enforcement, as well as the execution, of this collective bargaining agreement constitutes an unfair labor practice, and that these are two logically separate violations, independent in the sense that they can be described in discrete terms.

---

picketing during the six-month period to have been undertaken for the unlawful purpose of obtaining recognition, although the only affirmative evidence of such purpose was based on acts done prior to that period, the decision is not inconsistent, so far as presently relevant, with the cases discussed above. Substantial evidence of purpose from within the limitations period was found in reliance on the inference that the earlier motive had continued unchanged. *Id.*, at 1428, 1438. While the permissibility of an inference of this nature was rejected in the preceding cases, we need not now inquire into this seeming disparity of treatment, for it affects the minor premise only, and does not impair the accuracy of the proposition that, however marshalled, acts within the limitations period must under Board doctrine yield some substantial evidence of unlawful conduct.

[14] *Katz* v. *Labor Board*, 196 F. 2d 411, and *Labor Board* v. *Gaynor News Co.*, 197 F. 2d 719, relied on below and in dissent here, arose under provisions of the Act (§ 8 (a) (3), 61 Stat. 140) since repealed (65 Stat. 601), which permitted union security agreements only with unions which possessed a Board certificate that a union security clause had been authorized at a special election of the employees involved. While the language, and perhaps the approach, of these cases may be considered inconsistent with the principles we deem governing here, the decisions on their facts present no such difficulty. Proof of the nonexistence of such a certificate, which of course was a continuing fact, plainly did not require resort to testimony about past events; rather the issue was much like one arising out of an agreement illegal on its face, the only difference being that a separate instrument was involved.

Nevertheless, the vice in the enforcement of this agreement is manifestly not independent of the legality of its execution, as would be the case, for example, with an agreement invalid on its face or with one validly executed, but unlawfully administered. As the dissenting Board members in this case recognized, in dealing with an agreement claimed to be void by reason of the union's lack of majority status at the time of its execution,

". . . the circumstances which cause the agreement to be invalid existed only at the point in time in the past when the agreement was executed and are not thereafter repeated. For this reason, therefore, the continuing invalidity of the agreement is directly related to and is based solely on its initial invalidity, and has no continuing independent basis." 119 N. L. R. B., at 516.

In any real sense, then, the complaints in this case are "based upon" the unlawful execution of the agreement, for its enforcement, though continuing, is a continuing *violation* solely by reason of circumstances existing only at the date of execution. To justify reliance on those circumstances on the ground that the maintenance in effect of the agreement is a continuing violation is to support a lifting of the limitations bar by a characterization which becomes apt only when that bar has already been lifted. Put another way, if the § 10 (b) proviso is to be given effect, the enforcement, as distinguished from the execution, of such an agreement as this constitutes a *suable* unfair labor practice only for six months following the making of the agreement.[15]

---

[15] We think the rule in conspiracy cases, where the statute of limitations only begins to run upon the commission of the last overt act in furtherance thereof, does not furnish a useful analogy in this case. The statute in question here bars issuance of a complaint "based upon any unfair labor practice" which occurred more than six months

The Board's ruling is further sought to be supported on the ground that it did not rest on a formal finding that the execution of the 1954 agreement constituted an unfair labor practice. The Court of Appeals, while stating that the Board could not draw "any legal conclusion with regard to events outside the statutory period," distinguished the decision here as resting on the "mere *existence* [of the facts surrounding the making of the 1954 contract] rather than on ascribing legal significance to those facts standing alone." 105 U. S. App. D. C., at 108, 264 F. 2d, at 581 (emphasis by the court). This distinction sacrifices the policy of the Act to procedural formalities. If, as is not disputable, the § 10 (b) limitation was prompted by "complaint that people were being brought to book upon stale charges," *Labor Board* v. *Pennwoven, Inc.,* 194 F. 2d 521, 524, it is a particular *use* of the pre-limitations facts or conduct at which the section is aimed, and it can hardly be thought relevant that the proscribed

prior to the filing of the charge; it does not merely bar proceedings against an unfair labor practice which are not commenced within six months after that unfair labor practice has been committed. Cf. 18 U. S. C. § 3282. Our conclusion that the complaints giving rise to the judgment under review are of necessity "based upon" the unfair labor practice of execution of the agreement, and are barred by time, has drawn on this statute's purpose and history, and we do not assert the universal applicability of our resolution of the particular question presented for decision. In any event, the commission of an overt act pursuant to a conspiratorial agreement represents a renewed affirmation of the unlawful purpose of the conspiracy. The acts constituting enforcement of a collective bargaining agreement cannot well be so characterized. Beyond that, one may question the appropriateness of analogizing this situation, where proper application of a particular statute of limitations involves taking into account competing values, to one which involves an unlawful agreement of a kind unreservedly condemned, and the entire undoing of which is the undiluted purpose of the criminal law. Indeed, the rule advanced in dissent cannot be squared with the Board's own approach to the statute. See the cases discussed in notes 12 and 13, *ante.*

use has not been labeled as such. The applicability of the policy of § 10 (b) in the *Grain Millers* case, *supra,* where in the particular circumstances of that case, and not because of anything arising from § 10 (b), the challenged acts within the limitations period could not be condemned as unlawful without an express declaration that earlier conduct constituted an unfair labor practice (see note 12, *ante*), was not greater than it is here, where although there was no "finding" that execution of the agreement constituted an unfair labor practice, it is manifest that were that not in fact the case enforcement of the agreement would carry no taint of illegality. The availability of the repose sought to be assured by § 10 (b) cannot turn on the vagaries of any such hypertechnical distinctions, bearing no relation to the purpose of the legislation.

It is apparently not disputed that the Board's position would withdraw virtually all limitations protection from collective bargaining agreements attacked on the ground asserted here. For, once the principle on which the decision below rests is accepted, so long as the contract—or any renewal thereof—is still in effect, the six-month period does not even begin to run. Cf. *Bowen Products Corp., supra,* at 732. In *Lively Photos, Inc.,* 123 N. L. R. B. 1054, the Board unhesitatingly applied the doctrine of the case at bar to an attack upon an agreement executed more than three and one-half years prior to the filing of the charge. The cease-and-desist order entered in that case directed the severance of a bargaining relationship which had been initiated five years earlier. A doctrine which does such disservice to stability of bargaining relationships could be upheld, in light of the language and evident purpose of § 10 (b), only by a convincing showing that Congress did not intend that provision to be applied so as to bar attacks on collective agreements with unions lacking majority status unless brought within six months of their execution. Far

from providing such a showing, the legislative history contains affirmative evidence that Congress was specifically advertent to the problem of agreements with minority unions, had previously been at pains to protect such agreements from belated attack, and manifested an intention, in enacting § 10 (b), not to withdraw that protection.

Four years prior to the enactment of the Taft-Hartley amendments, of which the § 10 (b) limitations proviso was one, Congress barred the Board from proceeding, under certain conditions not here relevant, in cases "arising over an agreement between management and labor which has been in existence for three months or longer without complaint being filed." National Labor Relations Board Appropriation Act, 1944, 57 Stat. 515. This legislation was enacted with specific reference to agreements with minority unions,[16] and was re-enacted in each succeeding session through 1947.[17] At the time the Senate Committee on Labor and Public Welfare reported S. 1126 (the Senate version of the proposed legislation enacted as the Labor Management Relations Act, 1947), a rider to the appropriations bill for the fiscal year 1948

---

[16] The immediate impetus to the legislation was the pendency of an N. L. R. B. proceeding involving a closed-shop agreement in effect at the Kaiser shipbuilding yards at Portland, Oregon. The agreement, though executed at a time when only 66 workers were employed, was being applied to a 20,000-man work force. The debates show that the issue of representation by minority unions was in the forefront of legislative concern. See 89 Cong. Rec. 6950 (remarks of Reps. Smith and Tarver), 6953 (Rep. Tarver), 7029 (Sens. Truman and Ball), 7031–7032 (Sen. Wagner).

[17] The National Labor Relations Board Appropriation Act, 1945, 58 Stat. 568, made several amendments in the limitations provisions, the principal of which were designed to render the rider inapplicable to agreements with company-dominated unions, and to provide an additional three-month period at the commencement of any renewal of an agreement in which a complaint could be filed. See 9 N. L. R. B. Ann. Rep. (1944), pp. 5–6. Subsequent re-enactments were without relevant change. 59 Stat. 378, 60 Stat. 698.

(H. R. 2700, 80th Cong., 1st Sess.) was pending before the Senate Appropriations Committee, having been previously reported by the House Appropriations Committee in language identical with that of its predecessors. The Labor Committee's discussion of the proposed § 10 (b) amendment is illuminating:

> "The principal substantive change in this section is a provision for a 6-month period of limitations upon the filing of charges. The Board itself by adopting a doctrine of laches has to some extent discouraged dilatory filing of charges, and a rider to the current appropriations bill (*which if this amendment was adopted would no longer be necessary*) contains a 3-month period of limitations with respect to certain kinds of unfair labor practices." S. Rep. No. 105, 80th Cong., 1st Sess., p. 26. (Emphasis added.)

This language cannot be squared with an interpretation of § 10 (b) which would ascribe to Congress, in enacting for the first time a general limitations provision, a purpose to eliminate the then-existing all-embracing limitation specifically applicable to agreements with minority unions.[18]

---

[18] This conclusion seems to us not vitiated by the fact that the Senate Appropriations Committee, subsequent to the issuance of the Labor Committee Report, amended the appropriations rider in a manner perhaps susceptible of an interpretation which would render it inapplicable to agreements with minority unions. S. Rep. No. 146, 80th Cong., 1st Sess., pp. 6, 13. Nor is it sufficient to attempt to explain away the language of the Committee Report by reliance on the fact that, while the appropriations riders immunized agreements invalid on their face as well as those invalid for lack of majority status, see 8 N. L. R. B. Ann. Rep. (1943), pp. 7–8, § 10 (b) is more narrowly framed, and concededly does not protect an agreement invalid on its face from attack six months after its execution. Under the broad union security proviso to § 8 (3) of the original Act, 49 Stat. 452, invalidity of an agreement on its face was not a common problem, and we should not have expected Congressional discussion to have

In sustaining the Board's position, the Court of Appeals also relied on the public character of the right sought to be vindicated by the Board, and the limited scope of judicial review of Board determinations. Observing that "in interpreting, applying and administering a statute of limitations prescribed by Congress in this context [the field of labor relations], the Board—and the courts—are not confronted by precisely the same considerations as apply to statutes of limitations affecting the private rights of two individual litigants," the Court reasoned that "[t]he Board may have thought that the interests of [employee] self determination outweighed otherwise important competing considerations of burying stale disputes." 105 U. S. App. D. C., at 108–109, 264 F. 2d, at 581–582. We think this analysis inadmissible here, for the reason that the accommodation between these competing factors has already been made by Congress. It is a commonplace, but one too easily lost sight of, that labor legislation traditionally entails the adjustment and compromise of competing interests which in the abstract or from a purely partisan point of view may seem irreconcilable. The "policy of the Act" is embodied in the totality of that adjustment, and not necessarily in any single demand which may have figured, however weightily, in it. Cf. note 7, *ante*. It may be asserted, without fear of contradiction, that the interest in employee freedom of choice is one of those given large recognition by the Act as amended. But neither can one disregard the interest in "industrial peace which it is the overall purpose of the Act to secure." *Labor Board* v. *Childs Co.*, 195 F. 2d 617, 621–622 (concurring opinion of L. Hand, J.). Cf. *Colgate Co.* v. *Labor*

---

been primarily concerned with it. As we have seen, however, agreements with minority unions were specifically the focus of Congressional attention in this period, and the direct relevance of the Committee's discussion to the history of that problem is evident.

*Board,* 338 U. S. 355, 362–363. As expositor of the national interest, Congress, in the judgment that a six-month limitations period did "not seem unreasonable," H. R. Rep. No. 245, 80th Cong., 1st Sess., p. 40, barred the Board from dealing with past conduct after that period had run, even at the expense of the vindication of statutory rights.[19] "It is not necessary for us to justify the policy of Congress. It is enough that we find it in the statute. That policy cannot be defeated by the Board's policy . . . ." *Colgate Co.* v. *Labor Board, supra,* at 363. Cf. *Southern S. S. Co.* v. *Labor Board,* 316 U. S. 31, 47.

*Reversed.*

MR. JUSTICE FRANKFURTER, dissenting.

While agreeing with my Brother WHITTAKER's grounds for dissenting, I should like to add confirming considerations for his conclusion. At a time when the union did not represent a majority of employees, union and employer entered into a collective bargaining agreement, containing a "union security" clause compelling all employees to become members of the union. Under principles accepted by the Court, this constituted an "unfair labor practice," for it tended "to restrain or coerce employees" in the exercise of their right "to bargain collectively through representatives of their own choosing." Union and employer continued to carry out the terms of

---

[19] Adoption of a six-month period of limitations, criticized by opponents of the legislation as "the shortest statute of limitations known to the law," S. Rep. No. 105 (pt. II), 80th Cong., 1st Sess., p. 5 (Minority Report), was resisted on the ground that it gave "unjust assistance to employers or unions which commit those types of practices which are easily concealed and difficult to detect." 93 Cong. Rec. 4905 (remarks of Sen. Murray).

It need hardly be pointed out that we are not dealing with a case of fraudulent concealment alleged to toll the statute. See 105 U. S. App. D. C., at 110, 264 F. 2d, at 583 (dissenting opinion).

this illicit agreement. Specifically, the union purported to act as an authorized bargaining agent, union dues were collected through a "check-off" by the employer, and employees were compelled to become members of the union within forty-five days. The Court's opinion recognizes that all this constituted continuing interference with the employees' free choice and was therefore a continuing unfair labor practice.

Ten months after the collective agreement was first entered into, but while its terms continued to be actively carried out, an unfair labor practice charge against the union and employer was filed with the Board. Plainly, the continuing unfair labor practice of maintaining the collective agreement illegally entered into did occur within six months of the filing of the charge. The Court accepts this as true. But the Court holds that a charge based upon that continuing unfair practice is time-barred.

The applicable statute of limitations provides: "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." The Court relies on the fact that the active carrying out of the agreement, concededly an unfair practice occurring within six months, is revealed as unlawful only by reason of the unlawful character of the agreement at its inception, specifically, the fact that the union did not represent a majority of employees at that time. The Court concludes that the action is barred because the inception of the unlawful agreement was outside of the statutory period.

Such an interpretation, I respectfully submit, is not to enforce congressional legislation, which is our task, but is to fashion linguistic legislation and then apply it. Instead of barring only those complaints "based upon any unfair labor practice *occurring* more than six months prior to the filing of the charge," the statute is made to read "based upon any unfair labor practice *having had its inception*

more than six months prior to the filing of the charge." Thus the complaint is held barred, even though an unfair practice did *occur,* with due regard to the thought conveyed by that word. That is, we have here not mere inert continuity of consequences through antecedent action; events were brought to pass through conscious human intervention within six months of the filing of the charge.

I see no justification for such rewriting of what Congress wrote. The legislative history recited by the Court makes no such demand. Congress no doubt wanted to put stale claims to rest, and it did so by a relatively short statute of limitations for permitting claims to be brought to litigation. If six months are allowed to pass by without a charge against an unfair labor practice being filed, Congress said that is an end of the matter, and a charge cannot be filed thereafter. But Congress did not say that if a charge is filed within six months of the occurrence of an unfair practice, that cannot be halted, that cannot be proceeded against, if such labor practice had its inception more than six months before. On the contrary, what I deem a controlling analogy leads me to apply the statute as I find it, and to bar complaints only when based upon active occurrences not falling within the six-month period. I find that analogy in the treatment of the same kind of problem in cases where a conspiracy is entered into before a statutory period but is actively kept alive within that period.

The essence of the unfair labor practice involved in this case is the making and maintaining of an illegal agreement between union and employee. Suppose that Congress, having defined such an agreement to be an unfair labor practice, had subjected it not only to civil remedies but had also made it a misdemeanor. That is by no means a fanciful supposition. The federal antitrust statutes are a prominent instance of the use of the criminal law,

and in particular the law of conspiracy, as part of a scheme of industrial regulation. Suppose a six-month statutory limitations period for the criminal charge, as we now have for the civil, and suppose the very facts of this case. Specifically, suppose it had been charged that during the prior six months, by maintaining their collective agreement, entered into when the union did not represent a majority of employees, the union and employer had conspired to deprive employees of their rights freely to choose bargaining representatives, and that during those six months overt acts had been committed in pursuance of the unlawful agreement.

To find a cognate statute of limitations to be a bar to such a case would be to ignore the applicable precedents. The rules set out by this Court for applying statutes of limitations to conspiracy cases are clearly otherwise. See *United States* v. *Kissel,* 218 U. S. 601; *Hyde* v. *United States,* 225 U. S. 347, 367–370; *Brown* v. *Elliott,* 225 U. S. 392, 400–401; *Fiswick* v. *United States,* 329 U. S. 211, 216; *Grunewald* v. *United States,* 353 U. S. 391, 396–397. "The statute of limitations, unless suspended, runs from the last overt act during the existence of the conspiracy." *Fiswick* v. *United States, supra,* at 216. And these cases show that this principle applies even when, as here, the overt acts within the statutory period derive their illegal significance only when interpreted in light of an illegal agreement which was initiated prior to the statutory period for bringing a charge. Certainly, the illegalities committed within the six-months period in this case, to the same degree as overt acts in pursuance of a conspiracy already formed, represent "a renewed affirmation of the unlawful purpose," expressed in an agreement which Congress has outlawed as an unfair labor practice. A conspiracy is kept alive by an overt act within the period of the statute of limitations not by reason of some dogmatic postulate relevant to conspiracies, but as a result

of judicial reasoning in applying statutes of limitations. This reasoning is equally applicable to the matter in hand.

I am baffled to understand why the present case should be different from what it would be were it a prosecution for criminal conspiracy, rather than a civil proceeding based on an agreement giving rise to an unfair labor practice.

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE FRANKFURTER joins, dissenting.

The Court correctly recognizes (1) that it is violative of employees' rights guaranteed by § 7, and an unfair labor practice by an employer under § 8 (a) and by a labor union under § 8 (b), of the National Labor Relations Act, for an employer and a labor union to enter into a contract providing either for the recognition by the employer of the union as the representative of its employees or that its employees must become and remain members of the union, unless the union, at that time, represented a majority of the employees in the unit, (2) that "The maintaining of such an agreement in force is a continuing violation of the Act," and (3) that the bargaining contract involved in this case not only recognized the union as the exclusive bargaining representative of the employees, but also required the employees to become and remain members of the union, although the union did not then represent a majority of the employees in the unit.*

Despite the foregoing, the Court holds, I think, with deference, quite inconsistently and erroneously, that § 10 (b) of the Act barred the issuance of a complaint,

---

*In fact, the undisputed testimony was that the union did not then represent a single one of the employees, and that the employer acceded to the union's demand for recognition and entered into the contract simply because the union had it "over a barrel."

upon an employee's charge filed with and served by the
Board 10 months after the making of the contract, based
not upon the making of the contract, but alleging that,
within and throughout the period of six months preceding
the filing and service of the charge, the employer and the
union required the employees to become and remain mem-
bers of the union, and, once in each of those six months,
caused certain sums to be deducted from the employees'
wages and paid over to the union, all without the
authorization of the employees.

The Court, noting the employer-union contention that
the contract was "tainted" only by its "unlawful execu-
tion," and that "since a complaint based upon *that* unfair
labor practice [would be] barred" by § 10 (b), *that event*
could not be utilized "to *infuse with illegality* the *other-
wise legal* union security clause or its enforcement,"
adopts that argument as presenting the "correct view."
(Emphasis added.)

Surely the fact that a prosecution for the *making* of a
"tainted" contract is barred by limitations does not
"infuse" the "tainted" contract with *legality*. Moreover,
I respectfully submit that the complaint here was not
based upon the "tainted" contract, and that its unlawful
*execution* was not utilized "to infuse [the always illegal
contract] with illegality." Rather, the complaint here
was based upon and limited to independent acts of the
employer and the union, committed within six months
preceding the filing and service of the charge, that
deprived the employees of rights guaranteed to them by
§ 7, resulting in unfair labor practices under § 8; and the
fact that prosecution for the illegal *execution* of the
"tainted" contract is time-barred, as an independent
wrong, may not be utilized "to infuse with" *legality* the
illegal "union security clause or its enforcement."

It is important carefully to note what it is that § 10 (b)
bars. It says, in relevant part, that *"no complaint* shall

issue *based upon* any unfair labor practice *occurring more* than six months prior to the filing of the charge . . . ." (Emphasis added.) The bar is, then, against the issuance of a "complaint" that is "based upon" acts "occurring more" than six months prior to the filing of the charge. In the plainest possible sense, then, it does not bar the *issuance of a complaint based upon acts occurring within six months of the filing of the charge.* The complaint that was issued here was based upon acts occurring within six months of the filing of the charge. And the Board rested its decision solely on those acts.

But the Court holds that, although § 10 (b) is only a statute of limitations, evidence of the illegality of the contract is inadmissible, in the circumstances of this case, because it would serve "to cloak with illegality that which was otherwise lawful," and would permit a time-barred event "to be so used [as to revive] a legally defunct unfair labor practice." This conclusion gives hip rather than heed to the conceded rule that "the maintaining of such an agreement in force is a continuing violation of the Act," for it makes incompetent all relevant evidence that may be adduced to prove the "continuing violation." Moreover, such a rule is contrary to the decisions of this Court and to every decision of the Courts of Appeals upon the point to which our attention has been directed.

In *Federal Trade Comm'n* v. *Cement Institute*, 333 U. S. 683, this Court held it to be:

"well within the established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny. *Standard Oil Co.* v. *United States*, 221 U. S. 1, 46–47; *United States* v. *Reading Co.*, 253 U. S. 26, 43–44." 333 U. S., at 705.

To the same effect, but directly dealing with unfair labor practices, are *Paramount Cap Mfg. Co. v. Labor Board,* 260 F. 2d 109, 112–113 (C. A. 8th Cir.); *Labor Board v. Gaynor News Co.,* 197 F. 2d 719, 722 (C. A. 2d Cir.), aff'd *sub nom., Radio Officers* v. *Labor Board,* 347 U. S. 17; *Katz v. Labor Board,* 196 F. 2d 411, 415 (C. A. 9th Cir.); *Labor Board v. General Shoe Corp.,* 192 F. 2d 504, 507 (C. A. 6th Cir.); *Labor Board v. Clausen,* 188 F. 2d 439, 443 (C. A. 3d Cir.); *Superior Engraving Co. v. Labor Board,* 183 F. 2d 783, 791 (C. A. 7th Cir.).

In the *Katz* case, almost identical with this one on the point in issue, the Court specifically rejected the contention that, inasmuch as more than six months had expired from the date of the *execution* of the tainted contract, the complaint, based upon acts occurring within six months of the charge, was barred by § 10 (b), saying:

> "While . . . the mere execution of the agreement on December 17, 1948, constituted an unfair labor practice, there is no doubt but that the continuous enforcement of the agreement thereafter within the six months period prior to the filing of the charge, was an unfair labor practice, and with respect to this continued and continuous enforcement of the illegal union shop agreement, the prosecution of the proceeding was not barred by limitations." 196 F. 2d, at 415.

In the *Gaynor* case, the Court, after pointing out that although the tainted contract had been executed more than six months prior to the filing of the charge, and its *execution* was therefore barred as an independent subject of punishment by § 10 (b), observed that enforcement of the contract was "a continuing offense," and held that the complaint, based only on acts occurring within six months

of the filing of the charge, was lawfully issued and "in all respects valid." 197 F. 2d, at 722.

Although still recognizing that enforcement of a tainted labor contract "is a continuing violation" of the law, the Court further says that this is true "solely by reason of circumstances existing only at the date of execution"; and it therefore concludes that evidence of the taint is inadmissible in a proceeding to punish unlawful conduct occurring from enforcement of the contract within six months of the filing of a charge. I respectfully submit it is plain that this reasoning negates the conceded rule that enforcement of a tainted contract is "a continuing offense." The Court's reasoning, inconsistently, would at once both recognize, and deny any means of proving, the "continuing offense."

Analytical curiosity provokes the query whether such an *illegal* contract, openly posted in the plant but not made effective in practice until the first day of the seventh month, would then become so "infused" with *legality* as to be unassailable by the employees—not because its enforcement is not "a continuing offense," but, rather, because, under the Court's rule, there can be no competent evidence of its illegality. If so, the rule of "continuing offense" is utterly destroyed. If not, the Court's rule that there can be no competent evidence of the continuing violation must give way. The two theories are diametrically opposed and self-destructive. Section 10 (b) does not at all deal with the competency or admissibility of evidence. Surely, as the cited cases hold, any evidence which shows that continuing enforcement of the contract is or is not an offense under the Act is competent under the law.

But there is even a more fundamental consideration which, for me, settles this issue beyond all controversy. While it is the burden of the General Counsel of the Board

to prove his case, all he need do, initially at least, is to make a prima facie case. He may do this, in a case like the present, simply by putting on evidence showing that the employer and the union, within six months preceding the filing of the charge, required the employees to become and remain members of the union and to submit to deduction of dues from their wages without asking them for authorization and without any election, or Board certification of the union. That evidence alone would raise prima facie the issue: By what right was this done? That issue would call for a defense, and the burden of producing the defense would necessarily fall upon the employer and the union. Surely it will not be said that anything in § 10 (b), or elsewhere in the law, makes incompetent all evidence that might be adduced by the employer and the union to meet their burden and justify their action. If, as I submit cannot be denied, such evidence is competent when offered by the employer and the union, it must likewise be competent when, if he so elects, it is offered by the General Counsel of the Board. Here, at the very least, the General Counsel made a prima facie case of continuing violations of the law within the six months preceding the filing of the charge, the employer and the union made no effort to show the legality of their conduct in the period complained of.

The Court attributes to its rule the virtues of quieting "stale claims" and of "stabiliz[ing] existing bargaining relationships." I cannot agree that it would do either, for employee rights, occurring within six months of the filing of the charge, are not "stale claims," and deprivation of those rights which, as the Court of Appeals said, "rankles at least once a month in the mind of [the employees] offended," is not conducive to industrial peace and would not—certainly not legally—"stabilize existing bargaining relationships." At all events, and however this may be, these matters were for Congress; and the cardinal pur-

poses of the National Labor Relations Act, contained in § 7, were to guarantee to employees the right to join or assist labor organizations "of their own choosing" or to refrain from such activities. Surely, the continuing offense of enforcing a contract, made by an employer with a union which was not of the employees' "own choosing," was not intended by Congress to be left without a remedy. Congress did not intend to create and "to hold out to [employees] an illusory right for which it was denying them a remedy." *Graham* v. *Brotherhood of Firemen,* 338 U. S. 232, 240. Certainly, "any limitation on the employees' right[s] [under] §§ 7 and 8 . . . must be more explicit and clear than it is here in order to restrict them at the very time they may be most needed." *Mastro Plastics Corp.* v. *Labor Board,* 350 U. S. 270, 287. See also *Labor Board* v. *Lion Oil Co.,* 352 U. S. 282, 289.

Believing that the Board and the Court of Appeals correctly decided this case, I would affirm the judgment.