**GULFCOAST TRANSIT COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 19460.

United States Court of Appeals
Fifth Circuit.
May 13, 1964.

Wofford H. Stidham, Bartow, Fla., V. Lee McMahon, McMahon & Zempel, St. Louis, Mo., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marion Griffin, Atty., Stuart Rothman, Gen. Counsel, NLRB, Washington, D. C., for respondent.

Abraham E. Freedman, Charles Sovel, Philadelphia, Pa., Cooper, Ostrin, De-Varco & Ackerman, New York City, Herman E. Cooper, Robert H. Sand, New York City, of counsel, for National Maritime Union of America, AFL-CIO, amicus curiae.

Before BROWN, GEWIN and BELL, Circuit Judges.

GEWIN, Circuit Judge.

This case is before the Court on the petition of Gulfcoast Transit Company (Company) to review and set aside a decision and order of the National Labor Relations Board (Board) adopting the findings and conclusions of the trial examiner that the Company was guilty of the following unfair labor practices: (a) violation of Section 8(a) (1) and (5) of the National Labor Relations Act (Act) as amended by refusing to bargain exclusively with the National Maritime Union (NMU), the charging party; and (b) violation of Section 8(a) (1) and (2)[1] of the Act as amended by interfering with the administration of and contributing financial or other support to Gulfcoast Transit Unlicensed Personnel Association (Association). The Company was ordered to bargain with NMU and to cease and desist from bargaining with the Association. The Board filed a cross-petition seeking enforcement.

Section 10(b) of the Act[2] provides that a complaint shall not issue based on any unfair labor practice which occurs more than six months before the filing of the charge with the Board and service of a copy of the charge upon the person against whom it is made. In view of the limitations of the proviso the chronology of events involved in this case should be observed carefully.

The Company operates a single vessel, the SS Martha Mac, a bulk cargo carrier, transporting coal from New Orleans to Tampa, then phosphate back to New Orleans. The vessel is manned by thirty-four unlicensed personnel and some three

1. 29 U.S.C.A. § 158.

2. 29 U.S.C.A. § 160. The pertinent provisions of § 10(b) are as follows:

"Section 10(b) Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge."

or four officers. On January 30, 1960, an election was held pursuant to the Act, NMU won and on February 8, 1960, was certified as the exclusive bargaining representative of the unlicensed personnel. On March 30, 1960, and April 30, 1960, the Company and NMU met and bargained, but no agreement was reached. On May 5, 1960, twenty of the thirty-four men walked off the vessel on an economic strike. The twenty were replaced the same day and the vessel continued to sail. Negotiations were held thereafter on May 12, July 12 and 13, and August 4 and 5, 1960. At this point, no agreement had been reached and the parties were hopelessly deadlocked over certain of NMU's demands concerning the use of a union hiring hall, and proposed pension plans. A federal mediator was called into the controversy and further negotiations were held in October of 1960, and January of 1961. Both parties made a number of concessions, though no agreement was reached because of NMU's demands as to the hiring hall and pension plan.

In May of 1960, after the strike, the crew members received the following letter from Rick Miller, National Representative of NMU:

"NATIONAL MARITIME UNION
OF AMERICA

"Affiliated with the American Federation of Labor and the Congress of Industrial Organizations
    "NATIONAL HEADQUARTERS
    "346 West 17th Street, New York 11, N.Y.
    "TELEPHONE: OREGON 5-7300
"TO THE SCAB OF THE SS MARTHA MAC:

"After God had finished the rattlesnake, the toad, the vampire, He had some awful substance with which he made a scab.

"A scab is a two-legged animal with a corkscrew soul, a water-logged brain, a combination backbone of jelly and glue. Where others have hearts, he carries a tumor of rotten principles. When a scab comes down the street, men turn their backs and angels weep in heaven, and the Devil shuts the gates of Hell to keep him out.

"No man has a right to scab as long as there is a pool of water to drown his carcass in, or a rope long enough to hang his body with. Judah Iscariot was a gentleman compared with a scab. For betraying his Master, he had character enough to hang himself. A scab has not. Esau sold his birthright for a mess of pottage. Judas Iscariot sold his Savior for thirty pieces of silver. Benedict Arnold sold his country for a promise of a commission in the British Army. The modern strikebreaker sells his birthright, his country, his wife, his children and his fellow men for an unfulfilled promise from his employer, trust or corporation.

"Esau was a traitor to himself; Judas Iscariot was a traitor to his God; Benedict Arnold was a traitor to his country; a strikebreaker is a traitor to his God, his wife, his family and his class.
                "By JACK LONDON

    *    *    *    *    *    *

"You will have to live with what you have done for the rest of your lives.

"Every American seaman, every longshoreman, every waterfront worker in America has been told of your despicable behavior.

"All ships at sea everywhere in the world will receive reports at 118 E.S.T. Sunday, May 8, 1960 of the kind of animal that boarded the SS Martha Mac from a launch at Tampa, Fla. Thursday, May 5th, and scurried up ladders under cover of darkness escourted (sic) by armed guards to steal jobs from striking seamen while the wives and children hurled stones at you in desperation.

"You have paid a pretty stiff price for a piece of silver. Enjoy it while you can.

"Rick Miller, National Rep.
"NATIONAL MARITIME UNION"

In June of 1960 the unlicensed personnel held a meeting to discuss the formation of an "opposing association." Delegates from the various departments were elected and dues were fixed. On September 28, 1960, some of the officers of the ship met with the delegates and agreed to recognize the delegates elected.[3] The Association held monthly meetings, usually while at sea, in the crew's mess, which also served as the sparetime room or recreation room for the crew. Notices relative to the Association's activities were sometimes posted in the crew's mess. The Association was eventually formalized by the unanimous adoption of a charter and a name.

The Company argues that the cumulative effect of the replacement of the strikers, NMU's vile and filthy letter to the crew, and the crew's subsequent actions in forming the Association, was sufficient to allow the Company to treat NMU as repudiated, having lost the support of a majority of the crew. The Company contends that "unusual circumstances" existed which authorized it to cease negotiations with NMU short of the completion of the certification year.[4] Our decision is based on the provisions of Section 10(b), and therefore it is unnecessary to decide other questions or consider other contentions.

The section 10(b) cut-off date is November 16, 1960.[5] Therefore, unless there is evidence of unlawful labor practices transpiring after November 16, 1960, which, when considered without the evidence of such practices preceding November 16, 1960), would sustain the findings and conclusions of the trial examiner that petitioner has engaged in unfair labor practices, we must reverse.

■ The question presented for our decision is whether substantial evidence, on the record considered as a whole, supports the Board's findings that, within six months preceding the filing of unfair labor practice charges (after November 16, 1960), the Company failed to bargain with NMU in good faith; bargained and processed grievances with the Association, in derogation of NMU's certification rights; and gave unlawful support and assistance to the Association, in violation of Section 8(a) (5), (2), and (1) of the Act.[6]

Essentially the same problem was presented to the Supreme Court in Local Lodge No. 1424, Internat. Ass'n of Ma-

3. This occurred before the cut-off date, that is, November 16, 1960.

4. In its brief the Company expresses its contention as follows:
"We do not attack the Board's 'certification year rule.' Applied to the facts in the Brooks case it is a logical rule. We do attack its rigid application in a case such as this. The rule is not sacred. The fact that the Courts consistently make the reservation that a certification is valid for one year 'in the absence of unusual circumstances' manifests a clear intent that the rule be flexible rather than rigid.

"This case presents a situation where it is obvious that the rule should be flexibly applied. The employees who selected the NMU no longer work for the Company. They have been legally permanently replaced by employees who have worked in open defiance of both the strikers and the Union. By openly defying the NMU and by joining an opposing association the present employees have repudiated NMU. NMU has, through its officers exceeded the bounds of common decency in its irresponsible filthy, personal villification of the very employees it now claims to represent. Such a combination constitutes unusual circumstances."

5. Charges were filed on May 16, 1961.

6. The following is from the Board's brief:
"Events occurring prior to November 16, 1960, predated the filing of the unfair labor practice charges by more than 6 months. In accordance with Section 10 (b) of the Act, these events are relied on only as background to provide continuity and meaning for the actions of the Company after that date. See Local Lodge No. 1424, I.A.M. [A.F.L.-C.I.O.] v. N. L. R. B., 362 U.S. 411, 416–417 [80 S.Ct. 822, 4 L.Ed.2d 832]."

chinists, A.F.L.-C.I.O. v. N. L. R. B., (1960) 362 U.S. 411, 80 S.Ct. 822, 4 L. Ed.2d 832. The Supreme Court concluded that a collective bargaining agreement which contained a "recognition" clause and a "union security" clause, executed at a time when the union did not represent a majority of the employees —hence unlawful and an unfair labor practice—could not be attacked under an unfair labor practice complaint instituted over six months after the execution of the contract. Although it was there noted that "[t]he maintaining of such an agreement in force is a continuing violation of the Act," the Court held that the complaint could be sustained only if it had been filed within six months after the execution of the agreement. The complaints were held to be barred by time:

"It is doubtless true that § 10(b) does not prevent all use of evidence relating to events transpiring more than six months before the filing and service of an unfair labor practice charge. However, in applying rules of evidence as to the admissibility of past events, due regard for the purposes of § 10(b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely 'evidentiary,' since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice."

* * * * * *

"Indeed, some Board cases have gone even further and held § 10(b) a bar in circumstances when, although none of the material elements of the charge in a timely complaint need necessarily be proved through reference to the barred period—so that utilization of evidence from that period is ostensibly only for the purpose of giving color to what is involved in the complaint—yet the evidence in fact marshalled from within the six-month period is not substantial, and the merit of the allegations in the complaint is shown largely by reliance on the earlier events. See, e. g., News Printing Co., 116 NLRB 210, 212; Universal Oil Products Co., 108 NLRB 68; Tennessee Knitting Mills, Inc., 88 NLRB 1103. However, we express no view on the problem raised by such cases, for here we need not go beyond saying that a finding of violation which is inescapably grounded on events predating the limitations period is directly at odds with the purposes of the § 10(b) proviso."

* * * * * *

"In any real sense, then, the complaints in this case are 'based upon' the unlawful execution of the agreement, for its enforcement, although continuing, is a continuing *violation* solely by reason of circumstances existing only at the date of execution. To justify reliance on those circumstances on the ground that the maintenance in effect of the *agreement is a continuing violation* is to support a lifting of the limitations bar by a characterization which becomes apt only when that bar has already been lifted. Put another way, if the § 10(b) proviso is to be given effect, the enforcement, as dis-

tinguished from the execution, of such an agreement as this constitutes a *suable* unfair labor practice only for six months following the making of the agreement."

██ A careful review of the record fails to convince us that the conduct of the Company with its employees during the Section 10(b) period (subsequent to November 16, 1960), supports the charge of unfair labor practices. It is only when events beyond the bounds of the period are brought into evidence can the charges be sustained. Unquestionably, the meeting of the ship's officers with the Association in September of 1960 constitutes ample evidence of the Company's refusal to bargain with NMU, but that took place prior to the cut-off date. Every contact between officer and crew member and every word spoken cannot be used to impute a sinister motive or unlawful conduct.[7] Certain contacts between crew and officers are inevitable. With thirty-four unlicensed employees and three or four officers aboard, confined for the most part to the area of a small vessel, it would be too strict a standard to say that there should never be any comment about events which transpired aboard the ship. The statements in the minutes of the Association, if not considered hearsay, see United States for Use and Benefit of Burton Mill and Cabinet Works v. A. J. Rife Construction Co., 224 F.2d 600 (5th Cir. 1955), do not sufficiently prove that the Company had recognized the Association and was bargaining with it during the six months period. Such minutes show

only casual conversation between individuals.[8] It is our conclusion that the contacts between the officers and the unlicensed crew members as shown by the record do not constitute bargaining with the Association or recognizing it as the bargaining agent. The record shows that there were meetings between NMU and the Company through January, 1961. There were comments to the effect that events seemed to demonstrate that the bargaining agent had lost the support of the unlicensed employees but there was never a refusal to deal with NMU. Facing the realities of the case, one must conclude NMU had lost the support of the majority of the employees and that the relationship between the employees and NMU had become bitter and unsatisfactory. We do not insinuate that such a state of facts would justify the Company in refusing to deal with NMU during the year following certification, but we do conclude that conversations which mentioned a loss of support do not constitute a refusal to bargain.[9] What was said by this Court in American Federation of Grain Millers, A.F. of L. v. National Labor Rel. Bd., (5th Cir. 1952) 197 F.2d 451, in passing upon the applicability of Section 10(b), and the union's contention as to the obligation to bargain seems appropriate:

"Finally, we agree with the Board that what the union is in effect seeking to do is * * * mere connective incidents wherewith to bridge the fatal gap in time between the happenings really relied on as unfair labor practices and the six months'

---

7. N. L. R. B. v. McGahey, (5th Cir. 1956) 233 F.2d 406, 413:
   "An unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one."
   See also, Schwob Manufacturing Co. v. N. L. R. B., (5th Cir. 1962) 297 F.2d 864.

8. A typical excerpt from the minutes on which the Board relies in support of its

charge of refusal to bargain exclusively with NMU is the following:
   "Sommers went to Ch.Engr. and found reason for discharge of Dick Carter was for leaving station watch for 45 minutes while on watch endangering safety of ship."

9. Immediately following the expiration of the year after certification the Association petitioned the Board for an election for certification. NMU intervened and the election was not held. Thereafter, charges were filed by NMU.

bar, hoping thereby to cross over the six-months barrier which otherwise would preclude the charge."

For other cases refusing to give merit to the "continuing tort" theory, see N. L. R. B. v. Childs Co., (2nd Cir. 1952) 195 F.2d 617; N. L. R. B. v. Pennwoven, Inc. (3rd Cir. 1952) 194 F.2d 521; and, In Re Knickerbocker Mfg. Co. (1954) 109 NLRB 1195.

The second unfair labor practice found to have been committed was "interfering with the administration of the Association and by contributing financial or other support to it * * *." Again, we look to the six-month period allowed by Section 10(b) and find the evidence insufficient to support the finding. The activities of the Association were carried on in the crew's mess or spare-time room. There were never any officers of the ship present during the meetings. There is no evidence that permission to use the room for such purposes was granted. Indeed, a request for such permission would not be expected. This was the "living room" of the crew. To require the ship's officers to police the room and to see that the crew did not use it for purposes which they thought would be advantageous to their working conditions and life on the ship in general [10] is untenable. On our opinion, this situation is not at all analogous to the ordinary "dry land" situation where the union would have to obtain permission to use the Company's cafeteria or lunchroom for a meeting. In this situation, the use of the crew's mess for meetings and the posting of notices and minutes fails to constitute substantial evidence of Company support or interference.

Other evidence on which the Board based its finding of support and assistance is a conversation relative to the employment of an attorney by the crew to draw up a constitution for the

Association. There is no evidence that the officers or the Company procured the attorney, or suggested to the crew the employment of an attorney. Finally, the Board argues that the fact that the radio operator, a licensed officer, typed up the minutes of the meetings for the crew, supports the finding of Company assistance. We disagree. The radio operator was a member of a national union. The other ship's officers were members of an independent union. We are not persuaded that the radio operator was attempting to assist the Company in the formation of an independent union for its unlicensed personnel. Even if so, such nominal assistance at a time when events had clearly shown that NMU had lost its support, and that the crew was in the process of forming another union, would not, in our opinion, constitute substantial evidence of an unfair labor practice. In Re News Printing Co. (1956) 116 NLRB 210.

The order of the Board is set aside and enforcement of it is denied.

10. The purpose of the activities of the crew in the meeting was stated at the hearing to be:

"Well, they decided to have a meeting once a month in order to try to have the ship a better place to live, certain things that may be better improved and just to make it for the general welfare of the fellows aboard."