310 F.2d 539
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
Rubin BROWN, an Individual, d/b/a Ace Wholesale Electrical Supply Co.; Brown Wholesale Electrical Co.; Excel Electrical Supply Co.; and Brown Employees Association, Respondents.
 No. 17757.
 United States Court of Appeals Ninth Circuit.
 November 14, 1962.
 
 Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Melvin Pollack and Lee M. Modjeska, Attorneys, N. L. R. B., Washington, D. C., for appellant.
 Richard A. Perkins, Los Angeles, Cal., for appellee.
 Before BARNES and HAMLIN, Circuit Judges, and SOLOMON, District Judge.
 HAMLIN, Circuit Judge.
 
 
 1
 The National Labor Relations Board, after a hearing before a Trial Examiner, found that respondent employers and respondent Brown Employees Association were guilty of unfair labor practices in violation of Section 8 of the National Labor Relations Act (29 U. S.C. § 158), hereafter referred to as the Act. Respondents were ordered to cease and desist from such practices and in addition to take certain affirmative action.[1] The Board petitions this court for enforcement of its order. We have jurisdiction by virtue of Section 10(e) of the Act, 29 U.S.C. § 160(e).
 
 
 2
 Respondents oppose the enforcement of the Board's order, contending, inter alia, that the record does not support the findings of unfair labor practices.
 
 
 3
 Hyman Ram, an employee of Excel Electric Supply Co., filed a complaint on September 29, 1959, with the Board charging that he had been illegally discharged. Proceedings were thereupon commenced against respondents which culminated exactly one year later in the Board's order. The facts to be considered hereafter illustrate how long, involved, and costly proceedings can result from relatively insignificant events. The Board adopted the following findings of the Trial Examiner concerning the business of Respondent Brown and the nature of Respondent Brown Employees Association:
 
 
 4
 "Throughout the period with which this case is concerned, Rubin Brown has been engaged in business as a sole proprietor under the trade name and style of Ace Wholesale Electrical Supply Company; his principal office and place of business has been located in Los Angeles, California, where he is now — and at all times material has been — continuously engaged as a wholesale distributor of electrical supplies. The other segments of the respondent enterprise, Brown Wholesale, Excel and Courtesy, are California corporations; Brown Wholesale and Excel maintain their principal offices and places of business in Los Angeles while Courtesy maintains its principal office and place of business at Alhambra, California. Throughout the period with which this case is concerned, each of these respondent enterprises has been continuously engaged in the wholesale distribution of electrical supplies.
 
 
 5
 "Respondent Rubin Brown — supplementary to his sole ownership of Ace Wholesale, previously noted — owns the entire corporate stock of Brown Wholesale, Excel and Courtesy. Additionally, he serves as Courtesy's president, and Excel's vice-president, and Brown Wholesale's secretary.
 
 
 6
 * * * * * *
 
 
 7
 "[T]he available evidence establishes that Rubin Brown * * * maintains and operates Ace Wholesale Electrical Supply Company, together with Brown Wholesale, Excel and Courtesy, as related and integrated enterprises.
 
 
 8
 * * * * * *
 
 
 9
 "During the twelve-month period which ended September 30, 1959, Brown Wholesale, Excel, Courtesy and Rubin Brown, each separately received products valued in excess of $50,000 from out-of-state sources, directly or indirectly.
 
 
 10
 * * * * * *
 
 
 11
 "For every relevant purpose, they [the respondent employer organizations] may be considered a single, integrated employer, within the meaning of Section 2(2) of the Act, as amended, engaged in commerce and business activities which affect commerce within the meaning of Section 2(6) and (7) of the statute.
 
 
 12
 * * * * * *
 
 
 13
 "Brown Employees Association, designated as the Respondent Association in this report, is a labor organization within the meaning of Section 2(5) of the Act, as amended, which admits employees of the Respondent Employer only, to membership."
 
 
 14
 We believe that the above findings, establishing the jurisdiction of the Board in this case, are supported by substantial evidence in the record.
 
 
 15
 It would appear from the evidence that in the fall of 1956 various employees of the respondent enterprises were solicited to join the Teamsters Union. Shortly after the Teamsters' organizational activities began, Rubin Brown summoned the employees of the four respondent enterprises to meet after work at the premises of Brown Wholesale. At the meeting he reported the Teamsters' organizational effort and also repeated a purported threat by the labor organization to establish picket lines at the premises of each firm. Brown declared his unwillingness to recognize the Teamsters as the bargaining representative of his employees, beause of his uncertainty as to their representation of an employee majority. The employees were advised of their privilege to elect self-organization or to refrain from union membership, and were informed that respondent enterprises would maintain regular operations despite the possible presence of a picket line. The employees were told that everyone willing to work would be welcome. After these statements Brown and the managers of the respondent enterprises left the meeting. Thereafter, the suggestion was made by an unidentified employee that the employees of respondent enterprises form their own organization. A vote was taken and the Brown Employees Association, designated herein as Respondent Association, was formed. Apparently without formality, Harry Perlmutter, an employee of Brown Wholesale, was elected president. In March, 1957, the employee members held their first regular officers' election. Perlmutter was elected president; Paul Garner, Brown Wholesale's shipping clerk, was elected treasurer; and Veronne Kern, Brown Wholesale's head bookkeeper and self-styled office manager, was elected secretary. An Association representative was appointed for each respondent enterprise.
 
 
 16
 During this period Respondent Association and Respondent Employer negotiated four separate but identical trade agreements, covering certain conditions of employment. These agreements, having an effective date of March 1, 1957, were executed by Perlmutter and Garner for the Association and by Brown for each of the four respondent enterprises.[2]
 
 
 17
 On March 1, 1958, these agreements were replaced by contracts with substantially expanded provisions. The four agreements were again executed by Perlmutter and Garner in behalf of the Association and by Brown in behalf of the Respondent enterprises. Each agreement referred to the Employers' prior recognition of the Association as exclusive collective bargaining representative of its employees (except the manager and salesmen). The agreements contained the following "union-security" clause:
 
 
 18
 "As the condition of continued employment, all employees in the job classifications covered by this agreement shall become members of the Association within one year after the date of first employment and shall thereafter maintain membership in good standing in the Association."
 
 
 19
 In these agreements each employer agreed to maintain and finance the medical and hospital benefit plan previously established for the employees and their dependents, subject, however, to a provision that the plan benefits would become available to employees only after one year of service. Respondent Employer also agreed to provide $1,000 worth of group life insurance for each employee with one year's service. There were new provisions with respect to paid vacation time and modified sick leave. The termination clause in the agreement provided for a two-year contract term from March 1, 1958, to February 29, 1960, with provision for automatic renewal thereafter for annual terms in the absence of written notice by either party of termination.
 
 
 20
 On March 10, 1959, the Association adopted a constitution and by-laws. Article I of the Constitution listed the following as among the Association's objectives: The establishment and maintenance of "favorable schedules of wages, hours, and other conditions of employment" for members; reliance, "if possible, on friendly negotiations and arbitration to settle differences" between Association members and their employers, rather than on "strikes which engender needless strife and antagonism." Membership was limited to employees of the respondent enterprises and other California wholesale electric supply companies. The agreement also contained the following clause:
 
 
 21
 "A new employee of the companies may not apply for membership in this association until he has been employed by any or all of the companies for twelve consecutive months."
 
 
 22
 Under the constitution and by-laws dues of members were fixed at $1.50 per month, payable in advance on the first day of each calendar month. Dues not paid by the last day of the month in which they were due were declared to be delinquent. It was further provided:
 
 
 23
 "Members who fall in arrears three months shall stand automatically suspended as members of the Association, and any member who so becomes delinquent ceases to be a member in good standing."
 
 
 24
 The constitution authorized the president to serve as the Association's official representative in dealing with employers on matters concerning wages, hours, and other conditions of employment.
 
 
 25
 Shortly after the adoption of the constitution Harry Perlmutter resigned as president and Paul Garner was elected to replace him.
 
 
 26
 Hyman Ram began work at Excel in June, 1957. He worked as a packer, receiver, stockkeeper, order taker, and in various aspects of warehouse work. He joined the Brown Association in October, 1957, and, although somewhat irregularly, paid monthly dues thereafter.
 
 
 27
 In January, 1959, Ram spoke to Anthony Vessella, Excel's shipping and receiving clerk, who was also at that time Respondent Association's Excel representative, about getting a loan from the Association. On Vessella's recommendation the Association loaned him $50, which he repaid at the rate of $5 per week. In July, 1959, Ram applied through Vessella for a loan of $100, stating his intention to get married. Garner, then president of the Association, rejected his application. At the Association's next meeting in July, 1959, Ram questioned the propriety of rejecting his loan application and demanded a report with respect to the Association's emergency loan fund. A discussion developed at this meeting following Ram's demand which the Trial Examiner labeled as acrimonious. Ram paid dues on August 1, 1959, but during that month he decided to give up his Association membership.
 
 
 28
 Vessella resigned in mid-August as the Association's representative at Excel and Garner designated Cleo Habich, Excel's bookkeeper and office manager, as Vessella's temporary replacement. On August 28, 1959, the final payday of the month, Habich asked all employees to pay their Association dues. Ram refused. Habich told him, "You know what that means. If you don't pay, you don't work here." Further discussion developed, but Ram persisted in his refusal. Habich then told General Manager Fox of Ram's refusal and suggested that he (Fox) make an effort to persuade Ram to change his mind. Fox discussed the matter with Ram several times, both in August and September, and on each occasion urged him to pay his dues. On Friday, September 25, the final payday of the month, Habich distributed the payroll checks and again requested Ram to pay the Association dues. Upon his refusal, Habich testified that she told him that he knew what that decision meant; Ram's version was that she told him that he was fired. Ram then talked to Vessella, who suggested that Ram, having received his pay check for the full week, could leave immediately. Ram decided to follow Vessella's suggestion and at about 3 o'clock on that same day talked with Fox. During the discussion, Fox told Ram that Habich could not fire him and that if he left at that time he would be quitting. Ram testified that Fox said, "If you want to work you can work." Although Fox told Ram that he would have to pay his dues if he wanted to stay in the employ of the company, it is clear from the testimony of both Fox and Ram that he did not set a deadline as to when Ram either would have to pay or leave. Ram testified that Vessella set the deadline.
 
 
 29
 Ram left the plant on September 25 and four days later filed his complaint with the Board. Thereafter, by letter dated November 5, 1959, Ram was advised as follows:
 
 
 30
 "You left the employ of this company on or about September 25, 1959, because you were informed that you would be required to pay dues to Brown Employees Association under the terms of an existing labor contract. We believed that we could not continue you in our employ without violating our contract with our employees, represented by the Association. * * * Now we are informed that questions have been raised concerning the validity of the union shop requirements and its applicability to your case under the Taft-Hartley Act. * * *"
 
 
 31
 The letter went on to offer what general counsel for the Board conceded to be a valid offer of reinstatement to Ram. The parties have stipulated that the record established that on November 6, the day the letter was received, Ram did not desire reinstatement and that he did not thereafter desire reinstatement.
 
 
 32
 The Board concluded on the basis of the foregoing facts that Respondent Employer violated Section 8(a) (1), (2) and (3) of the Act by dominating, interfering with, and supporting Respondent Association; that therefore the union-security agreement with the Association was invalid; and that consequently Ram was illegally discharged. The Board also found that Respondent Association violated Section 8(b) (1) (A) and (2) of the Act by maintaining the unlawful union-security agreement with Respondent Employer and by causing the discharge of Ram pursuant to this agreement. In the alternative, the Board found that even if the union-security agreement were considered valid, Ram's discharge was violative of the Act because not in keeping with the terms of the agreement. The pertinent provisions of Section 8 of the Act are set forth in the margin.[3]
 
 
 33
 Under Section 10(b) of the Act, "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." As noted, the charge in this case was filed on September 29, 1959. Therefore, to support the finding of the Board that Respondent Employer dominated, interfered with, and supported Respondent Association, it must be shown that the employer engaged in such conduct during the six months period that falls between March 29, 1959, and September 29, 1959. We hold that there is no substantial evidence on the whole record to support such a finding.
 
 
 34
 The formation of the Association, execution of the employer-Association contracts, and adoption of the constitution and by-laws of the Association all occurred prior to March 29, 1959, and are thus immune from attack by the Board. Further, even assuming for the moment that they were illegal at their inception, their mere existence during the six months period here in question can not be considered an unfair labor practice.[4] To hold otherwise would in effect render the statute of limitations a nullity. Although such prior events may be utilized for the limited purpose of shedding light on occurrences within the six months period which in and of themselves may constitute unfair labor practices, they cannot be used to "cloak with illegality that which was otherwise lawful."[5]
 
 
 35
 The Board relies primarily on evidence that some officers of the Association who participated in Association affairs during the six months period had supervisory functions.[6] Because of their supervisory functions, the Board imputes their actions to Respondent Employer. The evidence reveals, however, that the officers had at best minor part-time supervisory duties. Further, there was no evidence that any of them had actual or ostensible authority to represent the employer in formulating labor relations policy. In view of the fact that the total work force of Respondent enterprises was approximately fifty people, eight to twelve of whom worked for Excel, the following statements of this court in Wayside Press, Inc. v. N. L. R. B.,[7] are particularly apt:
 
 
 36
 "Most of the evidence by which the Board seeks to tie Wayside to the formation and administration of the Independent Union is based upon the acts of foremen. It must be borne in mind that acts of such minor supervisory employees must be considered in their setting. * * * Here the foremen were union members who spent no more than 20 to 25% of their time in a supervisory capacity. Wayside is a small plant, employing some sixty persons. To attempt, as the Board has done, to apply the same standards to such a plant as are applied to plants employing hundreds of persons with full-time supervisory employees is to ignore reality."
 
 
 37
 It appears to be the position of the Board that by the mere fact that certain officers of the Association had "supervisory" functions it can be assumed that the other employees would believe that the officers functioned subject to the employer's will. Whereas the "state of mind" of the employees is important in a case of this type, we are not prepared to base our decision in this case on an assumption of a fact that finds no substantial support in the evidence contained in the record. The officers of Respondent Association were elected by secret ballot; there is no evidence that the employees did not seek to elect those individuals whom they felt could best represent their interests.
 
 
 38
 One other point deserves mention. The officers of the Association were elected prior to March 29, 1959. Assuming arguendo that the employees did form the belief that the officers were subservient to the wishes of Respondent Employer, what could the employer have done during the six months period to remedy this situation? If it demanded that the Association change its officers, it would be interfering with the affairs of the Association. On the other hand, the Board would have us believe that by doing nothing the employer was guilty of dominating, interfering with, and supporting the union. Under the Board's interpretation, any employer who is faced with such a situation is certainly on the horns of a dilemma. As previously stated by this court, however, "Acquiescence or approval are not what the Act contemplates when it uses strong words such as `interfere,' `restrain,' `coerce,' and `dominate' in Section 8(a) (1) and (2)."[8]
 
 
 39
 There being no substantial evidence in the record to support the finding of the Board that Respondent Employer within the six months period dominated, interfered with, or supported the Association, the union-security agreement was not invalid.
 
 
 40
 Under the union-security agreement, a member who failed to maintain membership in good standing in the Association was subject to discharge by the employer. The constitution of the Association provided that any member who fell three months in arrears in the payment of his dues ceased to be a member in good standing. Ram paid his August dues, but refused to pay his September dues. Obviously then he had not lost his good standing in the Association when he left the employ of Excel on September 25; had he stayed in the employ of the company and persisted in his refusal to pay dues he would have ceased to have been a member in good standing on November 30, 1959. The sole question remaining for our consideration is whether Ram was in fact discharged on September 25.
 
 
 41
 While the Board did not make a direct finding that Ram had been discharged, it did adopt the finding of the Trial Examiner that Ram's "determination to cease the performance of services immediately, though clearly voluntary, reflects his constructive discharge rather than resignation." There is no substantial evidence on the whole record to support this finding.
 
 
 42
 The only person at Excel who had authority to discharge Ram was Fox and it is clear that he did not do so. Any notion that Ram may have had that Habich could discharge him was in fact dispelled by Fox. Ram was told by Fox that he would have to pay his dues if he wanted to stay in the employ of the company, but no time was specified when Ram either would have to pay or leave. It is clear in this regard that Fox did not know when Ram would lose his good-standing membership in the Association for his failure to pay dues. Fox told Ram that he was "welcome to stay as long as necessary to fulfill the terms of the contract" and also told him that he would be quitting if he left on the 25th. Although there was some evidence in the record indicating that Ram was under the mistaken impression that he would be subject to discharge on September 30, surely, as between Fox and Ram, it was the latter's responsibility to ascertain his rights under the constitution of the Association.
 
 
 43
 Ram testified that Vessella set the deadline. Yet Vessella had no actual or ostensible authority to represent the employer. Nor did he have any authority to represent the Association. Ram reasonably could not have believed that Vessella had any power or right to determine when his employment should cease.
 
 
 44
 We conclude that Ram was not actually or constructively discharged. He voluntarily left his employment with Excel on September 25 and refused an offer of reinstatement tendered to him prior to the earliest date on which he would have been subject to discharge under the union-security agreement.
 
 
 45
 The petition of the Board for the enforcement of its order is denied.
 
 
 
 Notes:
 
 
 [1]
 The substance of the Board's order was as follows:
 
 
 [1]
 That the employers shall:
 (a) Cease and desist from:
 (1) Domination or interference with or support to Brown Employees Association.
 (2) Recognition of Brown Employees Association as the representative of its employees.
 (3) Encouragement of membership in Brown Employees Association.
 (4) Interference with, restraint or coercion of employees in the exercise of their right to self organization, etc.
 (b) Take the following affirmative action:
 (1) Withdraw and withhold all recognition from and completely disestablish Brown Employees Association as the representative of any of its employees.
 (2) Jointly and severally with Respondent Association make whole Hyman Ram for any loss of pay. (3) Post notices, etc., of compliance.
 
 
 [2]
 The Respondent Association shall:
 (a) Cease and desist from:
 (1) Performance, maintenance, enforcement or effectuation of its trade agreements executed March 1, 1958, in respect to union security.
 (2) Causing respondent employer to discriminate against employees because of their failure to acquire or retain membership in respondent association.
 (b) Take the following affirmative action:
 (1) Jointly and severally with Respondent Employer made whole Hyman Ram for any loss of pay. (2) Mail appropriate notices, etc.
 
 
 [2]
 The agreements contained four sections: First, the Respondent Association was recognized as the exclusive collective bargaining representative of the designated firms' employees, exclusive of the manager and the salesmen; Second, each employer agreed to establish and finance a medical and hospital benefit plan for employees and their dependents, with benefits under the plan available for employees after ninety days of service; Third, paid sick leave was established for the employees with two years of service; Fourth, the term of the agreement was set for one year, with provision for its automatic annual renewal thereafter, absent written notice of termination served by one party or the other at least sixty days prior to the agreement's scheduled expiration or anniversary date
 
 
 [3]
 "Section 8(a). It shall be an unfair labor practice for an employer —
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;
 "(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * *
 "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made; * * *.
 * * * * *
 "(b) It shall be an unfair labor practice for a labor organization or its agents —
 "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * * *
 "(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; * * *."
 
 
 [4]
 See Local Lodge No. 1424, International Ass'n. of Machinists, AFL-CIO v. N. L. R. B., 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960)
 
 
 [5]
 Id. at 417, 80 S.Ct. at 827
 
 
 [6]
 For example, Garner, President of the Association, was designated by the Board as "head" shipping clerk of Brown Wholesale. Although the designation is accurate, we agree with Respondents that it is somewhat less than candid in the light of the fact that Garner was the only shipping clerk at Brown
 
 
 [7]
 206 F.2d 862, 866 (9th Cir. 1953)
 
 
 [8]
 Wayside Press, Inc. v. N. L. R. B.,supra note 7, at 866.