NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

HOUSTON MARITIME ASSOCIATION, Inc., and its Member Companies, and Local 1351, Steamship Clerks and Checkers International Longshoremen's Association, AFL–CIO, Respondents.

No. 27469.

United States Court of Appeals, Fifth Circuit.

May 12, 1970.

Rehearing Denied and Rehearing En Banc Denied July 20, 1970.

Marcel Mallet-Prevost, Asst. General Counsel, N.L.R.B., Washington, D. C., Clifford Potter, Director, Region 23, N. L.R.B., Houston, Tex., Nancy M. Sherman, Atty., N.L.R.B., Washington, D. C., for petitioner.

Robert Eikel, Theodore Goller, William F. Walsh, John D. Roady, Houston, Tex., for respondents.

Before RIVES, GOLDBERG and GODBOLD, Circuit Judges.

GOLDBERG, Circuit Judge:

In this appeal we decline a most intriguing invitation to determine whether racial discrimination practiced by a union against a non-union member is an unfair labor practice. Our declination is necessitated by our finding that no acts of racial discrimination occurred within the time period allowed by the National Labor Relations Act for bringing unfair labor practice charges.

The National Labor Relations Board here seeks enforcement of an order against the Houston Maritime Associa-

tion and Local 1351, Steamship Clerks and Checkers, International Longshoremen's Association, AFL–CIO. Local 1351, by agreement with the Houston Maritime Association, is the sole source of clerks, checkers and timekeepers for members of the Association. The Union maintains a roster of prospective employees and refers workers to the Association members from this roster as they are needed. The Union, which was at one time a white local, apparently allowed all white applicants to register for the hiring hall roster and referred all registrants to employers in rotation on the basis of seniority. Beginning in the summer of 1963, five Negroes, the charging parties in this suit, made attempts to register for Union referral as clerks and checkers. Their early attempts were unsuccessful because Union policy forbade the registration of Negroes. Some weeks later, the Union membership voted to continue this policy and the complainants were so informed.

On September 3, 1963, however, a new policy was instituted. On that date the Union adopted what it refers to as a temporary overload policy which was designed to correct the disorganized and unmanageable condition of its referral roster. It is this policy which forms the basis of the Union's defense to the discrimination charges in the present suit. The effect of the overload policy was that the Union ceased accepting any applicants, black or white, for registration on the hiring hall roster. Only those who had registered prior to September 3, 1963, were referred through the hiring hall until July, 1965, when the temporary overload policy was terminated and a racially non-discriminatory merit system was instituted.

In 1964, while this temporary overload policy was in effect, the charging parties and others went to the hiring hall but were informed on each occasion that they could not register. Finally, on March 11, 1965, Leon Phelps filed this charge against the Union after the Union's president told him when he again attempted to register that they were still working on the Union policy regarding registration. The next morning Phelps and the four other charging parties went back to the hall where the president told all five that they were going to be allowed to register in the future, but that because of the temporary overload policy they could not then register. That afternoon the remaining four complainants filed their unfair labor practice charges with the Board.

At the hearing before the Trial Examiner the Union did not deny that racially motivated refusals to register the charging parties had occurred. It did claim, however, that this policy and all other racial discrimination had ceased prior to September 11, 1964, the date which marked the beginning of the six-month period prior to the filing of the charges herein. The Union argued therefore that though acts of racial discrimination had occurred, charges growing out of these acts were barred by § 10(b) of the National Labor Relations Act, 29 U.S.C. A. § 160(b), which provides that "[n]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." The Union's argument in this respect was predicated upon the temporary overload policy. It contended that since the overload policy prohibited the registration of any new applicants for referral, black or white, no discriminatory refusals could have occurred after September 3, 1963, a date more than a year before the § 10(b) six-month period began. Thus, while admitting that the charging parties were refused permission to register during the six-month period, the Union claims that these refusals, unlike the earlier ones, were based on a non-racial overload policy.

The General Counsel contended on the other hand that the Union's prior history of racial discrimination and its failure to mention the temporary overload policy to the charging parties until March 2, 1965, demonstrated that the overload policy was a mere subterfuge to perpetuate the Union's racial policy. He

argues therefore, that the Union's refusals to register the charging parties during the six months prior to the date the charges were filed were based on the applicants' race rather than on the Union's temporary overload policy.

The Trial Examiner, after hearing the evidence, concluded that the Union had valid non-racial reasons for adopting the temporary policy of refusing all applications for registration and that during the six-month period from September 11, 1964, until March 11, 1965, the Union's refusal to allow the charging parties to register was not racially motivated. The discriminatory refusals which occurred prior to September 11, 1964, he found were barred by § 10(b).

The Board, however, refused to accept the Trial Examiner's findings regarding the Union's motivation. Instead, the Board found as a matter of fact that the Union's refusals to register the charging parties during the six-month period were motivated by the fact that the charging parties were Negroes. The Board held that such racial discrimination was an unfair labor practice and entered an appropriate order.

 The Union contests enforcement of the Board's order, alleging that the evidence in the record does not support the Board's determination that racially motivated refusals to register the charging parties occurred within the six months immediately preceding the time the charges were filed. Agreeing with the Union, we deny enforcement.

 It is readily apparent that the narrow issue involved here is whether or not the Union's refusals to register the charging parties during the § 10(b) period were racially motivated. In reviewing the decision of the Board that they were, we are bound, of course, by the substantial evidence rule of Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

In appraising the record as a whole we begin by observing that the charging parties mentioned only two occasions after September 11, 1964, the beginning of the six-month period, when they approached the Union regarding possible registration—sometime near Thanksgiving of 1964, and March 11 and 12, 1965. If racially discriminatory refusals took place during the relevant period, they therefore must have occurred at one of these encounters. The Board in viewing the Union's conduct on these occasions placed great reliance on the fact that the charging parties were told, in effect, that they could not register because the Union had not worked out its policy regarding "coloreds." The Board found this evidence, combined with the prior history of racial discrimination and the Union's failure to mention the temporary overload policy until the March 12 meeting, sufficient to establish the fact that the registration refusals were occasioned by the applicants' race.

We cannot conscientiously agree that the record in its entirety furnishes substantial evidence to support the Board's conclusion. In the first place, of the five charging parties only Phelps testified that race was overtly alleged as the reason for the refusals during the six-month period. The other parties merely testified that they asked to register and were told they could not, an answer perfectly compatible with a policy of refusing registration to all on non-racial grounds. Moreover, when Phelps was questioned concerning his testimony he admitted that the Thanksgiving conversation related to whether he individually could register and that the question was not put on the basis of whether Negro people could register. Further, this same witness characterized his recollection of the exact content of all conversations prior to March 12, 1965, in the following manner:

"Because all other times, to be truthful, was just a babble, conversation here and conversation there, and I can't be up on everything that was said absolutely, to be truthful."

Opposed to this extremely weak testimony was the Union's evidence concerning its non-racial reasons for temporarily halting all registration. The Union's

president testified that the prior Union policy had been to allow all white applicants to register and to make referrals to the Association members from the roster without a formal rotation policy. As a result the Union had been under attack for discriminating between union and non-union registrants in the referral process. See Local 1351 Steamship Clerks and Checkers, etc. v. NLRB, 1964, 117 U.S.App.D.C. 304, 329 F.2d 259, *cert. denied,* Houston Maritime Ass'n, Inc. v. NLRB, 379 U.S. 872, 85 S. Ct. 19, 13 L.Ed.2d 79. To avoid further charges of this nature the Union adopted a policy of referring all registrants in rotation on the basis of seniority. The institution of this policy, however, caused severe problems according to the witness because the referral roster, with uncontrolled white registration, had accumulated the names of many workers who had not worked and were no longer interested in working. Nevertheless, each person on the roster had to be called in rotation to avoid charges of discrimination among those on the roster. According to the Union witness, the Union moved to remedy this chaotic situation on September 3, 1963, by closing the registration list to all new applicants until the situation was corrected.

In evaluating this evidence we find it significant that although the General Counsel had access to all Union records, he made no attempt to show that the Union roster was not in the condition alleged by the Union witnesses, and he made no attempt to show that a single person, black or white, was indeed allowed to register after September 3, 1963, the date the overload policy went into effect. We must therefore conclude, as did the Trial Examiner, that no applications were accepted after that date. We thus have a situation where the uncontradicted evidence shows a valid non-discriminatory motive for refusing all applications for registration. The only evidence indicating a contrary motive on the Union's part was the Union's past history of racial discrimination and one witness who later shed considerable

doubt on the accuracy of his own testimony.

The Trial Examiner in evaluating the evidence clearly credited the testimony of the Union's witnesses and concluded that in refusing to register the charging parties at Thanksgiving 1964, and in March, 1965, the Union was motivated by its new policy of revamping the registration procedures rather than by its old policy of racial discrimination. Although this finding was rejected by the Board, it is not without significance for this court. In *Universal Camera* the Supreme Court instructed:

"The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is 'substantial.'" 340 U.S. at 496, 71 S.Ct. at 469.

The Supreme Court's admonition regarding the findings of a Trial Examiner has been heeded by this court on numerous occasions when the Board and the Trial Examiner have disagreed. NLRB v. Neuhoff Bros. Packers, Inc., 5 Cir. 1968, 398 F.2d 640; Boaz Spinning Co. v. NLRB, 5 Cir. 1968, 395 F.2d 512; NLRB v. O. A. Fuller Super Markets, Inc., 5 Cir. 1967, 374 F.2d 197; Dobbs Houses, Inc. v. NLRB, 5 Cir. 1963, 325 F.2d 531.

In the present case the testimonial evidence supporting a racial motivation

for the refusals to register the charging parties at the Thanksgiving or March attempts was extremely weak. This evidence was so weak, in fact, that considering the testimonial evidence opposed to this view, we are in grave doubt that this evidence could be considered substantial. When we consider the additional fact that the Trial Examiner disagreed with the Board's finding, there is no doubt in our minds that the Board's finding of racial discrimination during the § 10(b) period is not supported by substantial evidence on the record as a hole.

In addition to its primary finding that the Union refused during the six-month period to register the charging parties because of their race, the Board appears to have made an alternative finding that racial discrimination occurred within the period due to the maintenance by the Union of an illegal pool of workers. The Board's argument in this respect is that the Union created an all white pool of workers by its earlier racial discrimination and that the effect of the temporary overload policy was to maintain this illegal pool. The Board found that the maintenance of this pool during the § 10(b) period was itself an unfair labor practice even if no racially motivated refusal to register the charging parties took place within that time. Unfortunately this position is untenable in view of the Supreme Court's opinion in Local Lodge No. 1424, International Ass'n of Machinists v. NLRB, 1960, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed. 2d 832. In *Local Lodge No. 1424* the Court made the following explanation concerning the time limit in § 10(b):

"It is doubtless true that § 10(b) does not prevent all use of evidence relating to events transpiring more than six months before the filing and service of an unfair labor practice charge. However, in applying rules of evidence as to the admissibility of past events, due regard for the purposes of § 10(b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely 'evidentiary,' since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice." 362 U.S. at 416–417, 80 S.Ct. at 826–827.

As we understand the distinction drawn by the Court in *Local Lodge No. 1424*, it is permissible in the case before us to consider the evidence regarding the Union's prior acts of racial discrimination to shed light on the true motivation behind the refusals to allow the charging parties to register during the six-month period. The evidence of prior acts is therefore admissible in support of the claim that racially motivated refusals to register the charging parties occurred within the § 10(b) period. This evidence was admitted and considered for that purpose. However, when viewed in light of the record as a whole we have found it insubstantial in view of the Union's evidence, credited by the Trial Examiner, that the Union's temporary policy of refusing to register anyone was not racially motivated.

The Board's alternative finding regarding the continuing illegality of the pool of workers because of the prior acts of racial discrimination falls

in the second category described by the Supreme Court in *Local Lodge No. 1424*. It is an attempt to revive a "legally defunct" act and is barred by § 10(b). There is no claim that an all white pool of workers is, standing alone, illegal. Rather the charge here is that racial discrimination created an all white pool, and it is the discrimination which is the basis of the unfair labor practice charge and the basis for the pool's claimed illegality. Some act of racial discrimination is therefore required in order to give the Union's referral list an illegal character. Assuming arguendo that the discrimination here asserted would be an unfair labor practice—a point which we reluctantly decline to decide—and would therefore create an illegal pool of workers, it is nevertheless plain that absent any discrimination the Union's referral roster would be a legal pool of workers. We have found on the record as a whole that no act of racial discrimination occurred within the § 10(b) period. The question, therefore, is whether the acts of racial discrimination which occurred prior to the § 10(b) period can be used to infuse illegality into the otherwise legal pool so that its maintenance during the six-month period can form the basis of an unfair labor practice charge. The Supreme Court in *Local Lodge No. 1424* unmistakably prohibited the use of time-barred acts for such a purpose. The referral list absent any discrimination was legal, and to use the time-barred acts of racial discrimination to infuse illegality into that pool is nothing more than "cloak[ing] with illegality that which was otherwise lawful," a result prohibited by § 10(b) of the National Labor Relations Act. 362 U.S. at 417, 80 S.Ct. at 827. We therefore reject the Board's alternative finding that acts of racial discrimination occurred within the limitation period because of the Union's maintenance of an illegal pool of workers.

There being insufficient evidence to support a finding of racial discrimina-tion during the § 10(b) period, we need not decide the far more compelling issue of whether such discrimination would have been an unfair labor practice. We simply have here a statutory prescription of repose which we are not at liberty to disturb.

Enforcement denied.

RIVES, Circuit Judge (dissenting):

With deference, I cannot agree with my brothers. I accept the Trial Examiner's finding that "from September 1963 through March 1965, a period of a year and a half, no one, white or Negro, was allowed to register for employment through Local 1351's hiring hall, and that only persons whose applications had already been accepted by September 1963, were thereafter referred for work." The Trial Examiner also found that " * * * *other* [than racial] factors legitimate enough by themselves, *also* motivated the Union to call a halt to registrations." (Emphasis added.) What my brothers overlook is that, in addition to "valid non-racial reasons for adopting the temporary policy of refusing all applications for registration,"[1] the Trial Examiner specifically found "that the Union was motivated in September, 1963, to adopt its policy of rejecting all applicants because it wished to continue rejecting Negroes." (App. 20.) He also referred to "the *well-founded* suspicion that the freeze was continued so long merely to keep Negroes out for as long as possible." (Emphasis added.) (App. 17.)

The Board agreed with the Trial Examiner's finding that the "freeze" policy "was motivated by the Union's wish to continue rejecting Negroes' applications." (App. 35.) Only a short time before adopting the freeze, "the Executive Board and the Local's membership voted to continue to bar Negroes from membership and from obtaining work through the Local's hiring hall." (App. 34, 35.) That fact, together with the answers given to Negroes when they at-

---

1. Majority opinion, p. 586.

tempted to register, and the fact that the freeze continued for a year and a half clearly constitute substantial evidence to establish a reasonable inference that the freeze was racially motivated.[2] That being true, the Board's conclusion that racial discrimination motivated the Union's refusals to allow the charging parties to register during the six-month period seems inescapable.

I agree with the well-reasoned decision of the Board.[3] Indeed, I am so thoroughly convinced that the Board's decision is sound that I take the liberty of quoting at length the following pertinent part of that decision:

"The Trial Examiner found the existence of a Union policy of rejecting Negro applicants at the Union's hiring hall prior to September 1963. He also found, and we agree, that the adoption by the Union in September 1963 of a 'freeze' policy, whereby all applicants, white or Negro, were to be denied registration, was motivated by the Union's wish to continue rejecting Negroes' applications. Nevertheless, the Trial Examiner concluded that since under the Union's 'freeze' policy, the practice of refusing registrations was not directed against *some* applicants because of their race but was directed against *all* applicants, because of an excess of registrants entitled to referral through the hiring hall, the practice of rejecting all applicants not being illegal on its face could only be converted into an illegal action by relying solely on a time-barred event, i. e., the pre-September 1963 rejection of Negroes' registration for job referrals.[6]

"6. The uncontradicted testimony of the Charging Parties is that at no time when they made application to the Union were they told that the reason for refusal was because of the 'freeze policy.' To the contrary, they they were informed, in substance, that the Local was not accepting applications from Negroes.

"It is true that a mere surface statement of the Union's 'freeze' policy, i. e.,

that no further applicants will be registered regardless of race, would not itself indicate whether a racially discriminatory factor is intrinsically [sic] built into its implementation, except to the white members and nonmembers who made use of the hiring hall and also to Negro applicants who had knowledge of the Union's racially discriminatory practices.[7]

"7. Local Union No. 269, International Brotherhood of Electrical Workers, AFL-CIO (Mercer County Division, etc.), 149 NLRB 768, enfd. 357 F.2d 51 (C.A. 3).

But the racial impact of the 'freeze' policy does become plainly revealed upon consideration of the background of elucidating union conduct preceding the adoption of such policy. Consideration of such relevant background is clearly proper in ascertaining the ingredients of the freeze policy and in determining what is really involved in the present maintenance of such practice. In thus appraising the policy, needless to say, we are not passing upon the validity of the Union's conduct during the pre-10(b) period before the freeze;[8] rather we de-

"8. We make reference here to these events as evidence to be considered only for background. Local Lodge No. 1424, International Association of Machinists v. N. L. R. B., 362 U.S. 411, 424 [80 S.Ct. 822, 4 L.Ed.2d 832].

cide only whether the maintenance and continuation of the practice presently entails a preference in employment referrals on the basis of race alone, that would be violative of Section 8(b) (1) (A) and (2) of the Act.

"The Union, a white local, by its act of 'freezing' its registrations effectively created a pool of white employees which constituted a preferred class in employment with the attendant benefits of seniority and possible attainment of union membership.[9] As a consequence, up un-

"9. This pool, in fact, continued as a source of the Union's job referrals up to the summer of 1965 at which latter time the Union adopted an *alleged* nondiscrimina-

2. *See* Pratt & Whitney Aircraft Division, etc. v. N. L. R. B., 5 Cir. 1962, 310 F.2d 676, 679; N. L. R. B. v. Clement Broth-

ers Company, 5 Cir. 1969, 407 F.2d 1027, 1030.

3. Reported at 168 N.L.R.B. No. 83.

tory policy and opened its registrations. It is to be noted that the Union's new policy followed the filing of the charges herein and the enactment of the Civil Rights Act of 1964 which became effective July 2, 1965.

til the summer of 1965, when Local 1351 adopted for the first time an alleged nonracial policy,[10] a preferential hiring

"10. This, as fully described by the Trial Examiner in his Decision, is not an issue here, and we make no findings with respect to such new policy.

arrangement continued in effect which barred Negroes. In our opinion, the fact that this 'freeze' policy was adopted by the Union more than 6 months prior to the filing of the charges herein, does not detract from the further fact that the Union's racially discriminatory policy was, as a result of such 'freeze,' continued and maintained from the time of its inception, through the time the charges were filed and subsequent thereto. We find, contrary to the Trial Examiner, that by adopting a practice which in operative effect created a preferred class in employment, the result was that the Union's previous policy of discrimination against Negroes as to job opportunities solely on the basis of race was continued and maintained. Accordingly, the Union, by rejecting the Charging Parties' applications for registration for referral, breached its duty of fair representation and as a result engaged in unfair labor practices in violation of Section 8(b) (1) (A) and (2) of the Act.[11]

"11. See Vaca v. Sipes [386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842].

"The Trial Examiner in his Decision cited *Bryan Manufacturing Co.*,[12] as

"12. Local Lodge No. 1424, International Association of Machinists v. N. L. R. B. (Bryan Manufacturing Co.), 362 U.S. 411 [80 S.Ct. 822, 4 L.Ed.2d 832].

controlling with respect to the Section 10(b) issues in this case. Here, we are not dealing with a situation where a violation of the Act depended wholly on proof of a prior state of events outside the Section 10(b) period as in *Bryan*. To the contrary, here the maintenance of an illegally preferred group and the consequent unlawful rejection of the Charging Parties because of their race continued through the 10(b) period. Thus, the record shows that Leon A. Phelps, a Negro and one of the Charging Parties herein, a number of times during 1964, including a visit a few days prior to Thanksgiving 1964, inquired at the hiring hall if there had been any change in the Local's policy with regard to the hiring of Negroes. At all times Phelps was denied the right to register and was informed in substance by the Local's agents that the matter of registering 'colored' was being worked on but no final decision had been made. Phelps again, on March 11, 1965, visited the hiring hall and asked Casey, who had become president of the Local in January 1965, if there had been any change in the Local's position about putting 'colored' people to work. Casey informed Phelps the Local was working on it, patience was needed, and that eventually some 'colored' people would get work. Nothing more specific was offered by Casey. As a result of this conversation, Phelps on the same day filed his charge herein. On the morning of March 12, 1965, Phelps and the other Charging Parties again called at the hiring hall and again inquired of Casey if there wasn't a chance of getting some work through the hiring hall. Casey replied, 'Yes, I think you are going to work here.' However, when Phelps inquired if the Charging Parties could register then and there, Casey gave the Charging Parties for the first time a new reason why the Charging Parties could not register. This was to the effect that the Union had a lot of misfits on its rolls that had to be gotten rid of, that the Local was not accepting applications even from whites, and that the Local had a backlog of applications. The Charging Parties were not informed when, if ever, they could register, or whether the Local was contemplating the adoption of a new, nondiscriminatory procedure. The result was that that afternoon the rest of the Charging Parties filed their indi-

vidual charges herein. Since the preferred group continued to exist beyond the time of the filing of the charges herein, the refusals of employment to the Charging Parties solely on the basis of race, as evidenced in the record, within the 10(b) period, establish the violations independently of the time of the initial establishment of the 'freeze' policy. Accordingly, we find contrary to the Trial Examiner, that the Union by such conduct engaged in unfair labor practices which were not barred by Section 10(b) of the Act.[13]

"13. Local Union No. 269, IBEW, AFL-CIO (Mercer County Division, NECA, ETC.), 149 NLRB 768, enfd. 357 F.2d 51 (C.A. 3)."

I therefore respectfully dissent.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

### PER CURIAM:

The· Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.

RIVES, Circuit Judge:

I dissent from the denial of the petition for rehearing.