William F. TOBIN

v.

TRANS UNION SYSTEMS CORPORATION.

Civ. A. No. 78–4368.

United States District Court, E. D. Pennsylvania.

March 4, 1980.

Edwin B. Barnett, Strong, Barnett, Hayes & Hamilton, Philadelphia, Pa., for plaintiff.

Mark S. Dichter, Michael A. Hacker, Morgan Lewis & Bockius, Philadelphia, Pa., Joel H. Kaplan, John W. Powers, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

The plaintiff, William F. Tobin, is now fifty-nine years of age. In January of 1977, before the events leading to this litigation, he was employed as Eastern Regional Vice President by the defendant, Trans Union Systems Corporation (TUSC). Since that time, Tobin claims that he has been demoted, denied proper compensation and generally shut out of company affairs in an effort to force him to resign or to fabricate a pretext for his dismissal. Tobin brought this action under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34, alleging that TUSC has discriminated against him because of his age. The defendant has moved for summary judgment on all or part of the complaint on the ground that the plaintiff failed to file a timely charge with the Secretary of Labor before bringing suit as required by § 626(d) of the ADEA.

The basic facts, taken in the light most favorable to plaintiff, are as follows. As of January 1, 1977 plaintiff was Eastern Regional Vice President of TUSC. Up to that time he had enjoyed a successful career with TUSC and its predecessor companies. On February 6, 1977 plaintiff was informed that he should begin to report to another regional vice president, S. L. Mularz, rather than directly to the president as he formerly had done. In the next few months, the president, W. J. Devers, withdrew permission for plaintiff to operate a company car and Mularz ridiculed plaintiff's business judgment on a personnel matter. On May 17, 1977 Mularz informed the plaintiff that as of July 1, 1977 he would be relieved of responsibility for New York. Mularz told the plaintiff that this change was not "personal" but the result of reorganization within the company.

Tobin did not accept Mularz's explanation. As of that date, May 17, 1977, he believed "absolutely" that he was the victim of age discrimination. Plaintiff's Answer to Defendant's Motion for Summary Judgment, ¶ 2; Tobin Deposition at 27–8. Plaintiff did not know that age discrimination

was unlawful, however, until September of 1977 when he retained a lawyer, his present counsel. Plaintiff met with his lawyer several times during 1977. He told the lawyer that he believed he was subject to age discrimination and the lawyer explained that age discrimination was unlawful, but expressed no opinion on the legality of defendant's conduct toward the plaintiff. Plaintiff learned in February 1978 that his bonus for 1977 would be $5,000—half the amount of the previous year—and that he would receive no salary increase in the coming year for the first time in his career with the defendant. Tobin Affidavit ¶ 2. On February 7, 1978, after receiving a memorandum from Mularz regarding his reduced bonus, plaintiff telephoned Mularz and asked what his salary would be for 1978 and when he would receive his annual performance appraisal. Mularz refused to discuss the appraisal, saying, "There's no point in talking about your performance appraisal—you wouldn't want to hear what I would have to say." Plaintiff's Answers to Defendant's First Set of Interrogatories at 41.[1] Plaintiff interpreted this comment to mean that his appraisal was unfavorable. He maintained that his performance had been outstanding, but to no avail.

Several months later, plaintiff's attorney sent a letter dated May 18, 1978 to the Director of Industrial Relations for defendant's parent corporation. In the letter, the attorney accused TUSC of age discrimination and demanded to meet with corporate counsel to discuss this charge as well as "incorrect" entries in plaintiff's personnel file. Plaintiff's attorney threatened to commence legal proceedings unless he received a response by May 31. The defendant acceded to Tobin's request for a meeting but adamantly refused to change its position. In July 1978, during the course of discussions between the parties, plaintiff gained access to his personnel records and found what he believed to be false statements. When, on July 21, President Devers refused to correct his records, plaintiff knew for certain that TUSC's actions were age-based. Five weeks later, on August 29, 1978, Tobin simultaneously filed charges with the Department of Labor and the Pennsylvania Human Relations Commission (PHRC). Plaintiff claims damages for the loss of bonus and salary increase in February 1978 and for a similar loss of compensation in February 1979, several months after his filing date.

Section 626(d) of the ADEA requires as a condition precedent to bringing suit that a grievant file a charge alleging unlawful discrimination with the Secretary of Labor:

(1) within 180 days after the alleged unlawful practice occurred; or

(2) in a case to which section 633(b) of this title applies, within 300 days after the alleged unlawful practice occurred, or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier.

Plaintiff concedes that the 180-day period in § 626(d)(1) applies in this case.[2] One

---

1. It is unclear if Mularz told plaintiff at this time that he would not receive a raise for 1978. In his affidavit, plaintiff gives the date as "February", Tobin Affidavit ¶ 2, but in his deposition he refers to "early" February. Tobin Deposition at 90.

2. It is not immediately obvious why plaintiff would make this concession. The longer 300-day period is available in a case to which § 633(b) "applies." Section 633(b) requires a litigant to "commence" state proceedings whenever there is a state agency, such as the PHRC, empowered to grant relief for age discrimination. Clearly § 633(b) "applies" in this case, but many courts, including the Third Circuit, have held that, despite the wording of the statute, an untimely state filing does not entitle the claimant to the extended 300-day period. *See, e. g., Bonham v. Dresser Industries, Inc.,* 569 F.2d 187, 192 n.5 (3d Cir. 1977), cert. denied, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); *Bertsch v. Ford Motor Co.,* 415 F.Supp. 619, 626 (E.D.Mich.1976); *Skoglund v. Singer Co.,* 403 F.Supp. 797, 803 (D.N.H.1975). Plaintiff's state notice clearly fell outside the 90-day period for filing with the PHRC, 43 P.S. § 959, and thus based on *Bonham,* he conceded the 180-day limitation.

Although counsel do not raise the issue, given the humanitarian purposes of the ADEA I note *mea sponte* that the continued vitality of *Bonham's* footnote 5 is at least debatable since the decision in *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609

hundred and eighty days before plaintiff's filing date was March 3, 1978.

In *Bonham v. Dresser Industries, Inc.*, 569 F.2d 187 (3d Cir. 1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978), the Third Circuit suggested a two-part analysis for assessing the timeliness of a charge under the ADEA. The first part of the inquiry is to determine when the discrimination "occurred" within the meaning of § 626(d). This question can be difficult when, as here, changes in employment status occur as a series of actions over a period of time rather than as a single event. The second part of the inquiry is whether circumstances exist which would justify equitable modification of the 180-day period. Tolling or estoppel may be called for when the plaintiff has substantially complied with the statute without prejudicing the defendant or when the defendant has lulled the plaintiff into sleeping on his rights.

On the issue of when the discrimination occurred, plaintiff argues that the 180-day period has not yet begun to run on any of his claims and will not begin to run while he remains a TUSC employee. As support for this contention Tobin cites the following language from *Bonham* : "An employee should not be required to take action to enforce his rights while he continues to work and while his employment status is at all uncertain." 569 F.2d at 192. Tobin submits that I am "bound" by this language to hold that the 180-day period does not begin to run so long as he is still employed at TUSC.[3]

This reading of *Bonham*, while certainly ingenious, proves too much. In effect, plaintiff would have the 180-day period apply only to discharges; any discrimination short of discharge would remain actionable during the employee's entire term of employment and for 180 days beyond. It is implausible, moreover, to ascribe such a radical revision of § 626(d) to *Bonham*. *Bonham* was a discharge case. The plaintiff was given notice on October 31 that he would be terminated effective December 31. Although he actually stopped working on the date of notice, he continued to receive his salary until the date of termination. The Third Circuit opted for the earlier date as the date of occurrence, holding that the period begins to run when an employee has notice of his discharge *and* actually stops working.

The 180-day period does not begin to run until the employee knows, or as a reasonable person should know, that the employer has made a final decision to terminate him, and the employee ceases to render further services to the employer. Until that time he may have reason to believe that his status as an employee has not finally been determined, and should be given an opportunity to resolve any difficulty while he continues to work for the employer. In any event, *a terminated employee who is still working should not be required to consult a lawyer or file charges of discrimination against his employer as long as he is still working, even though he has been told of the employer's*

(1979). In *Oscar Mayer* the Supreme Court adopted a strictly literal reading of § 633(b), holding that a state filing is mandatory but that an untimely filing is sufficient to "commence" state proceedings within the meaning of the statute. The Court commented that its conclusion was not altered by the fact that it permitted grievants to preempt state proceedings by filing after the state statute had run. *Id.* at 763-64, 99 S.Ct. at 2075. *Oscar Mayer* casts some doubt on *Bonham* because the Third Circuit's rationale for *not* reading § 626(d) literally was that rejected in *Oscar Mayer*—that otherwise grievants could preempt state proceedings by filing late and then take advantage of the lengthier federal filing period. *Bonham, supra*,

at 192 n.5. Despite this uncertainty I am nevertheless hesitant to assume that *Bonham* is no longer good law. Not the least reason for hesitation is that a literal reading of § 626(d) produces anomalies not mentioned in *Bonham*. Why, for example, must employers in deferral states wait an extra 120 days for repose without any notice of the pendency of a claim? In any event, I will apply the 180-day period in this case and leave the Court of Appeals to grapple further with this inscrutable provision.

3. Given the conjunctive phrasing of the *Bonham* language plaintiff must assume that his employment status with TUSC will henceforth always be precarious, but he does not so state.

*present intention to terminate him in the future.*

Bonham, supra, at 192.

The italicized language, which restates the passage on which plaintiff relies, places that passage in context. The Third Circuit's concern was that an employee who continues working after receiving equivocal notice of discharge should not have to choose between provoking his employer and trusting in his tender mercies. This concern does not lead ineluctably to a general rule that incumbent employees are exempt from the limitation period of § 626(d). On the contrary, Judge Stern expressly warned in *Bonham* against such a broad reading, stating that "no simple rule can be formulated which will deal adequately with all factual situations, . . ." *Bonham, supra*, at 191. I am not persuaded, therefore, that plaintiff's reading of *Bonham* is correct.

Not limiting himself to a textual argument, plaintiff contends additionally that policy considerations support an expansive application of the *Bonham* dictum. He maintains that it would be unfair to require him to have begun proceedings before he had "convincing evidence" of age discrimination and that it would be contrary to the conciliatory purpose of the ADEA to require a preemptive filing while the parties continued discussions. The essence of plaintiff's position is that early filing will "cause a hardening of the respective positions of the parties, discourage amicable settlements, and generate avoidable litigation." Plaintiff's Brief at 6.

Plaintiff's argument here seems to be addressed to both parts of the *Bonham* analysis. Insofar as he contends that no discrimination "occurred" until he had convincing evidence of its existence, plaintiff is simply mistaken. Under *Bonham* the operative fact of which plaintiff must be aware for the period to run is the employment action itself, not the employer's motivation for it. 569 F.2d at 192. As to plaintiff's empirical assertion that early filing is not conducive to good faith negotiation, the short answer is that he contemplates a stat-

utory scheme different from the one that Congress enacted. Under the ADEA, primary responsibility for conciliation rests with the state and federal agencies, not with the discriminatee. The purpose of the short 180-day filing period is to facilitate and encourage good faith conciliation by insuring that the Secretary of Labor is called in while the charges are fresh and that the employer is made aware of the possibility of litigation early on. *See, e. g., Dartt v. Shell Oil Co.*, 539 F.2d 1256, 1261 (10th Cir. 1976), *aff'd by an equally divided court*, 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 (1977). Plaintiff may find unwise or cynical the implied congressional judgment that employers require the threat of litigation to negotiate in good faith, but Congress's judgment is, of course, controlling.

The answer to plaintiff's policy argument is the same whether it is taken as addressed to the "occurrence" or the "tolling" issue. Potential litigants must often face the difficult choice of how long to continue settlement discussions before taking formal action. It is the very purpose of a limitation period to force an election at some point. "A litigant may not, however, avoid the statute of limitations simply because the decision it forces him to make—whether to pursue legal remedies before all avenues of informal settlement are exhausted—is a difficult one." *Wagner v. Sperry Univac, Division of Sperry Rand Corp.*, 458 F.Supp. 505, 516 (E.D.Pa.1978). There is, furthermore, no suggestion on the record that the defendant sent "positive signals" to the plaintiff during their discussions or in any other way encouraged him to rely on a voluntary resolution of his grievance. *See Bonham, supra*, 569 F.2d at 193. Hence, there is no predicate for estopping TUSC to assert the limitations period. Finally, I must note that plaintiff's core assumption that suspension of the period during informal negotiations would promote settlement is not free from doubt. It could just as well be said that under plaintiff's approach employers would reject any attempt to negotiate informally in the knowledge that they would be extending their exposure to litigation.

■ Turning to when the alleged unlawful practice occurred, it is undisputed that plaintiff was notified in May 1977 that he would no longer be responsible for New York operations effective July 1, 1977. By analogy to the *Bonham* test, Tobin had unequivocal notice *and* ceased to render services (in the capacity of regional vice president) on July 1, 1977. Assuming that plaintiff's loss of bonus and expected raise in February 1978 flowed from his earlier demotion, the 180-day period began to run July 1. Although this assumption is abundantly warranted, a fact finder could however, believe plaintiff's claim that the events of February were the result of defendant's ongoing efforts to get rid of him. By plaintiff's account, the unlawful practice did not occur until sometime in February when he learned of his loss of compensation. There is, thus, a factual dispute, but even so plaintiff's date of occurrence still predates the date of filing by more than 180 days. To determine if the factual dispute is material, it is necessary to consider the question of tolling.

■ I have already considered and rejected plaintiff's argument that the informal negotiations with the defendant initiated at his request justify equitable suspension of the running of the 180-day period. Plaintiff also asserts that TUSC should be estopped to raise a defense of untimeliness because it refused to permit plaintiff to view his personnel records until July of 1978 during the course of those negotiations.

■ In both his affidavit and his sworn answer to the present motion, plaintiff states that although he believed he was being subjected to age discrimination as of May 17, 1977, his belief did not harden into a "conviction" until he gained access to his personnel records and discovered what he believed were deliberate falsifications. Tobin Affidavit ¶¶ 1, 5, 9; Answer ¶ 2. Among the alleged falsehoods were notations that the plaintiff's health was poor, that he had no potential for promotion and that his performance was unsatisfactory. When President Devers refused to change the records, plaintiff concluded that he had solid evidence that TUSC officials were laying a basis for his discharge.

These facts have the indications of a classic estoppel: the defendant fraudulently concealed facts which prevented plaintiff from asserting his rights. Plaintiff's argument would have some appeal if he could show that defendant's concealment prejudiced him in any way, but he cannot. By plaintiff's own admission, when he finally saw his personnel file he had believed for more than a year that he was subject to age discrimination and had known for a least five months that his performance appraisal was unfavorable. According to his own version of the facts, Tobin had reason to believe and did believe that his personnel records were unfavorable and yes so, long before July 1978. All he could have learned when he saw them was the particular pretext that his superiors chose to invent—hardly vital information under the circumstances.

■ Aside from the lack of prejudice, plaintiff's assumption that his subjective "conviction" is legally relevant falls wide of the mark. The Third Circuit recently endorsed an objective standard for tolling under the analogous limitation provision of title VII in *Hart v. J. T. Baker Co.*, 598 F.2d 829, 834 (1979). In *Hart*, Judge Higginbotham rejected the argument, virtually identical to the one advanced here, that the period was tolled until the plaintiff had "confirmation" for her long-standing suspicion of discriminatory motive. Ordinarily ADEA and title VII grievants are entitled to judicial solicitude because they must initiate proceedings without legal assistance. *See Love v. Pullman Co.*, 404 U.S. 522, 527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1972). But in this case the plaintiff visited his attorney, discussed his belief that he was subject to age discrimination and learned that age discrimination was unlawful nearly a year before filing a charge with the Secretary of Labor. I see no justification for tolling the period because plaintiff allegedly was ignorant of his legal rights. *See Edwards v. Aluminum & Chemical*

*Sales, Inc.*, 515 F.2d 1195, 1200 n.5 (5th Cir. 1975).

 In addition to the points discussed this far, plaintiff raises briefly the argument that "the period of limitations does not apply to bar a *continuing* violation." Plaintiff's Brief at 7 (emphasis in original). The basis of this argument is not clear. If plaintiff means to say that the period does not run for earlier discrete events in a series of discriminatory actions simply because the pattern is continuing, his argument is without merit. *Platt v. Burroughs Corp.*, 424 F.Supp. 1329, 1335 (E.D.Pa. 1976).[4] Plaintiff also hints at a perpetuation theory, as for example when a seniority system or pension plan operates to give present effect to past discrimination. The three title VII cases cited by plaintiff all predate the Supreme Court's decision in *United Airlines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) which severely curtailed the perpetuation doctrine. "Respondent emphasizes the fact that she has alleged a *continuing* violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists." *Id.* at 558, 97 S.Ct. at 1889 (emphasis in original). Here plaintiff does not point to any "present *violation*" which would bring his loss of bonus and salary benefits within the limitation period, and "mere continuity" does not advance his cause.[5]

For the foregoing reasons I will grant defendant's motion as follows. I find that there is no disputed issue of material fact with respect to when the period of limitation began or whether it should be equitably modified. Taking the view of the evidence most favorable to plaintiff, his loss of bonus for 1977 and salary for 1978 occurred no later than February 1978. After reviewing the entire record, I find that there are no circumstances which would justify equitable modification. Accordingly, I hold that plaintiff's filing with the Secretary of Labor was untimely with respect to the events of February 1978 and that defendant is entitled to judgment as a matter of law as to all claims arising before March 3, 1978.

 Defendant argues that it is also entitled to judgment on plaintiff's loss of salary and bonus claims which arose in February 1979, some six months *after* the charge was filed with the Secretary of Labor. Defendant does not argue that this claim is procedurally faulty, and I note that there is persuasive authority that it is not. *See Anisgard v. Exxon Corp.*, 409 F.Supp. 212 (E.D.La.1975) (Rubin, J.); *see also Ricks v. Delaware State College*, 605 F.2d 710 (3d Cir. 1979) (prior notice of continuing title VII violation not untimely.) Rather, defendant claims that as a matter of substantive law it cannot be held liable since its actions were based on plaintiff's earlier demotion which is now legally defunct.

I disagree. Although defendant elicited several damaging admissions during plaintiff's deposition that "we wouldn't be here" absent the 1977 demotion, there is still other evidence from which a fact finder could infer that the February 1979 actions were part of a forward-looking effort to drive plaintiff out of the company and not wholly premised on the demotion. Moreover, on the record before me I am not satisfied with defendant's cursory treatment of the difficult question of when evidence of time-

---

**4.** "If Congress had so intended it could easily have provided in the statute that timely notice *as to any act of discrimination shall entitle the employee to relief as to all prior acts of discrimination*." 424 F.Supp. at 1335.

**5.** The allegedly false personnel reports will not serve this purpose. As discussed above, plaintiff had knowledge that the reports were unfavorable and probably false long before he actually saw them. Moreover, he experienced the effects of the unfavorable comments nearly contemporaneously with their creation. TUSC's refusal to correct the records and, presumably, to reinstate plaintiff stands on the same footing as a refusal to rehire a former employee who claims he was wrongfully discharged many years before. Refusing to correct past time-barred discrimination cannot be a present violation because the present act causes no additional injury. Any other rule would completely nullify the limitation period.

barred violations is admissible to contradict an innocent explanation of matters occurring within the limitation period. *See Local Lodge 1424, I.A.M. v. N.L.R.B. (Bryan Manufacturing Co.),* 362 U.S. 411, 416, 80 S.Ct. 822, 826, 4 L.Ed.2d 832 (1960). For these reasons defendant's motion will be denied as to the plaintiff's February 1979 damage claims.